# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 15, 2008         Decided August 22, 2008

No. 07-5127

FREE ENTERPRISE FUND AND BECKSTEAD AND WATTS, LLP,
APPELLANTS

v.

PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 06cv00217)

*Michael A. Carvin* argued the cause for appellants. With him on the briefs were *Viet D. Dinh*, *Sam Kazman*, *Hans F. Bader*, *Christian G. Vergonis*, and *Kenneth W. Starr*.

*Elizabeth Gallaway* and *William P. Pendley* were on the brief for *amicus curiae* Mountain States Legal Foundation.

*Daniel J. Popeo*, *Paul D. Kamenar*, *Helgi C. Walker*, and *Thomas R. McCarthy* were on the brief for *amicus curiae* Washington Legal Foundation in support of appellants.

*Jeffrey A. Lamken* argued the cause for appellees Public Company Accounting Oversight Board, et al. With him on the

brief were *Joe Robert Caldwell Jr.* and *James R. Doty*.

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellee United States of America. With him on the brief were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, *Mark R. Freeman*, Attorney, *Brian G. Cartwright*, General Counsel, Securities & Exchange Commission, *Andrew N. Vollmer*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, and *John W. Avery*, Special Counsel. *Robert J. Katerberg*, Attorney, U.S. Department of Justice, and *R. Craig Lawrence*, Assistant U.S. Attorney, entered appearances.

*Richard H. Pildes* was on the brief for *amici curiae* G. Bradford Cook, et al.

*Ira M. Millstein*, *Gregory S. Coleman*, and *Christian J. Ward* were on the brief for *amicus curiae* Council of Institutional Investors in support of appellees.

Before: ROGERS, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the court by *Circuit Judge* ROGERS.

Dissenting opinion by *Circuit Judge* KAVANAUGH.

ROGERS, *Circuit Judge*: In this facial challenge, appellants contend that Title I of the Sarbanes-Oxley Act of 2002 ("the Act"), 15 U.S.C. §§ 7211-19, violates the Appointments Clause of the Constitution and separation of powers because it does not permit adequate Presidential control of the Public Company Accounting Oversight Board ("the Board"). Congress, however, made the Board's exercise of its duties subject to the comprehensive control of the Securities and Exchange Commission ("the Commission"). Under the Act, the

Commission is empowered to set Board rules and procedures, to overturn any sanction proposed by the Board, and to limit or relieve the Board of its powers, *id.* §§ 7217(b)(2), (b)(5), (c)(3), (d)(1), (2); the Commission also may remove members of the Board for cause, *id.* § 7211(e)(6). Members of the Commission, in turn, are appointed by the President with the advice and consent of the Senate and subject to removal by the President for cause; its chairman is selected by and serves at the pleasure of the President. In appellants' view this statutory scheme vests Board members "with far reaching executive power while completely stripping the President of the authority to appoint or remove those members or otherwise supervise or control their exercise of that power." Appellants' Br. at 1. But their facial challenge ignores the entirety of the statutory scheme and runs afoul of the Supreme Court's instruction regarding the nature of the President's constitutional relationship with independent administrative agencies. Supreme Court precedent as we have it does not support appellants' singular focus on removal powers as the be-all and end-all of Executive authority, but rather compels a more nuanced approach that examines the myriad means of Executive control.

We hold, first, that the Act does not encroach upon the Appointment power because, in view of the Commission's comprehensive control of the Board, Board members are subject to direction and supervision of the Commission and thus are inferior officers not required to be appointed by the President. Second, we hold that the for-cause limitations on the Commission's power to remove Board members and the President's power to remove Commissioners do not strip the President of sufficient power to influence the Board and thus do not contravene separation of powers, as that principle embraces independent agencies like the Commission and their exercise of broad authority over their subordinates. Accordingly, we affirm the grant of summary judgment to the Board and the United

4

States.

**I**.

Following the Enron and Worldcom accounting scandals that exposed serious weaknesses in industry self-regulatory reporting requirements for certain publicly held companies, Congress enacted the Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7201 *et seq.*[1] Title I of the Act established the Board "to oversee the audit of public companies that are subject to the securities laws . . . in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports." 15 U.S.C. § 7211(a). The five members of the Board are appointed by the Commission after consultation with the Chairman of the Board of Governors of the Federal Reserve and the Secretary of the Treasury. *Id.* § 7211(e)(4)(A). The Act empowers the Board , subject to the oversight of the Commission, to, among other things, register public accounting firms, establish auditing and ethics standards, conduct inspections and investigations of registered firms, impose sanctions, and set its own budget, which is funded by annual fees. *Id.* §§ 7211(c), 7219(c), (d).

The Commission's authority over the Board is explicit and comprehensive. *Id*. §§ 7217, 7218. Indeed, it is extraordinary. The Board could commence operations only upon the Commission's determination that it was properly organized and had appropriate rules and procedures in place, *id*. § 7211(d), and "[n]o rule of the Board shall become effective without prior approval of the Commission," *id.* § 7217(b)(2). The Commission is empowered to "abrogate, add to, and delete from" the Board's rules "to assure the fair administration of the

---

[1] *See* S. REP. No. 107-205, at 2 (2002); H. R. REP. No. 107-414, at 18-19 (2002).

[Board], conform the rules promulgated by that Board to the requirements of title I of the [Act], or otherwise further purposes of that Act, the securities laws, and the rules and regulations thereunder applicable to that Board." *Id.* §§ 7217(b)(5), 78s(c). In addition to these *ex ante* controls, all Board adjudications are subject to the Commission's *de novo* review, *id.* § 7217(c)(2); *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 804 (D.C. Cir. 2005) ("*NASD*"), upon an immediate stay when an application for review is filed or *sua sponte* by the Commission, 15 U.S.C. §§ 7215(e)(1), 7217(c)(2)(A). The Commission is empowered to "enhance, modify, cancel, reduce, or require the remission of a sanction imposed by the Board." *Id.* § 7217(c)(3). The Commission alone determines whether the Board may "sue and be sued" in any court. *Id*. § 7211(f)(1). A member of the Board may be censured or removed from office "for good cause shown," *id.* § 7211(e)(6), upon a finding by the Commission, after notice and opportunity for a hearing, that the member willfully violated the Act or abused authority, or failed to enforce compliance with a rule or standard without reasonable justification, *id.* § 7217(d)(3). The Commission is further empowered, by rule, to relieve the Board, consistent with the public interest, of any enforcement authority whatsoever, *id.* § 7217(d)(1), as well as, by order, to censure the Board and, after notice and opportunity for a hearing, to "impose limitations upon the activities, functions, and operations of the Board" upon finding that the Board has failed to abide by its statutory duties, *id.* § 7217(d)(2).

This facial challenge to the Act is brought by the Free Enterprise Fund, a non-profit public interest organization that "promotes economic growth, lower taxes, and limited government." Compl. ¶ 11. It is joined by one of its members, Beckstead and Watts, LLP ("B&W"), a Nevada accounting firm that is registered with the Board and is subject to an ongoing

formal investigation that was commenced in 2005. *Id.* ¶ 79. On February 7, 2006, the Free Enterprise Fund and B&W (collectively "the Fund") filed a complaint alleging that the creation of the Board violated the Appointments Clause, separation of powers, and non-delegation principles. The Fund sought declaratory and injunctive relief prohibiting the Board from carrying out its duties, including taking "any further action" against B&W.  The United States intervened to defend the constitutionality of the Act.  The district court denied the Board's motion to dismiss the complaint for lack of jurisdiction and granted the motions for summary judgment of the Board and the United States.

The Fund appeals, and our review is *de novo.  See Simpson v. Socialist People's Libyan Arab Jamahiriya,* 470 F.3d 356, 359 (D.C. Cir. 2006); *Wilson v. Pena*, 79 F.3d 154, 160 n.1 (D.C. Cir. 1996).  To succeed in its facial challenge to Title I of the Act under the Appointments Clause and separation of powers,[2] the Fund bears a heavy burden to show that the provisions of which it complains are unduly severe in all circumstances and cannot be constitutionally applied.  *See Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1190 (2008) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

## II.

The Board and the United States contend, as a threshold matter, that the district court lacked jurisdiction because the Fund failed to exhaust the Act's statutory review procedures. The Act permits a person "aggrieved by a final *order* of the Commission" or a person "adversely affected by a *rule* of the

---

[2]  The Fund does not pursue its non-delegation claim on appeal.

Commission" to obtain review in the court of appeals. 15 U.S.C. § 78y(a)(1), (b)(1) (emphasis added). The Act further provides that "[n]o objection to an *order* or *rule* of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." *Id.* § 78y(c)(1) (emphasis added). The Fund did not pursue administrative remedies before filing its complaint.

As a matter of statutory text, the administrative procedures available under the Act are confined to challenges to an "order" or a "rule" of the Board. *See, e.g.*, *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 856 (D.C. Cir. 2002); *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 191 (D.C. Cir. 2004). The Fund's facial challenge, by contrast, advances a "broad-scale attack," *Nat'l Mining*, 292 F.3d at 856, to the Act itself that is not "of the type Congress intended to be reviewed within this statutory structure," *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). In *Thunder Basin*, the Supreme Court acknowledged that the district court retains jurisdiction over claims "considered 'wholly collateral' to a statute's review provisions and outside the agency's expertise." 510 U.S. at 212 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)).

Jurisdiction over the Fund's complaint is consistent with the distinction drawn by this court in *Time Warner Entertainment Co. v. FCC*, 93 F.3d 957 (D.C. Cir. 1996), which held that the district court has "general federal question jurisdiction to consider a facial challenge to a statute's constitutionality so long as that challenge is not raised in a suit challenging the validity of agency action taken pursuant to the challenged statute or in a suit that is collateral to one challenging the validity of such agency action," *id.* at 965. Because the complaint presents a "facial, or systemic" challenge, and not an "as-applied, or particularized challenge[],"

*Gen. Elec.*, 360 F.3d at 192 (internal quotation marks omitted), and does not attempt to bootstrap other claims regarding a Board order or rule, *see First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 695 (3d Cir. 1979), the Fund's lawsuit is not properly viewed as a circumvention of the Act's review procedures. In contrast with *American Coalition for Competitive Trade v. Clinton*, 128 F.3d 761 (D.C. Cir. 1997), where the statute granted the court of appeals exclusive jurisdiction over all constitutional attacks on the statute upon compliance with exhaustion requirements, *see id.* at 765, the Act contains no similar provision as would indicate that Congress intended the review scheme to be exclusive.

Therefore, because the Fund's constitutional challenges to the Act are collateral to the Act's administrative review scheme, the exhaustion doctrine does not apply, and we hold that the district court had subject matter jurisdiction over the complaint and properly denied the motion to dismiss.

### III.

The Appointments Clause provides:

> [The President] shall . . . nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2.

The plain text of the Appointments Clause thus contemplates that Congress may lodge the appointment power of inferior officers in entities other than the President. The Fund contends, however, that the absence of day-to-day supervision of the Board by the Commission and the for-cause limitation on the Commission's power to remove Board members means that Board members are not inferior officers and therefore must be appointed by the President. Alternatively, the Fund contends that even if Board members are inferior officers, they cannot be appointed by the Commission because the Commission is not a "Department[]" and the Commissioners are not its "Head[]."

**A.**

"Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond v. United States*, 520 U.S. 651, 662 (1997). Under this standard, the Board is composed of officers inferior to the Commission. The Commissioners, who serve staggered five-year terms, are "appointed by Presidential nomination with the advice and consent of the Senate," *id.* at 663, and they exercise comprehensive control over Board procedures and decisions and Board members. For instance, the Commission approves all Board rules, 15 U.S.C. §§ 7211(g), 7217(b)(2), and may abrogate, delete, or add to them, *id.* § 7217(b)(5). All Board sanctions are subject to plenary review by the Commission, *id.* § 7217(c)(2); *NASD*, 431 F.3d at 804, and the Commission "may enhance, modify, cancel, reduce, or require the remission of a sanction imposed by the Board," *id.* § 7217(c)(3). As such, the Board's disciplinary authority "ultimately belongs to the [Commission], and the legal views of the [Board] must yield to the Commission's view of the law," *NASD*, 431 F.3d at 806; *see also Gold v. SEC*, 48 F.3d 987, 990 (7th Cir. 1995); *Shultz v. SEC*, 614 F.2d 561, 568 (7th Cir.

1980). The Commission both appoints and removes Board members, *id.* §§ 7211(e)(4)(A), (e)(6). It also may impose limitations upon Board activities, *id.* § 7217(d)(2), and relieve the Board of its enforcement authority altogether, *id.* § 7217(d)(1).

Consequently, the Board's work is necessarily "directed and supervised at some level" by the Commission, *Edmond*, 520 U.S. at 663. Notably for purposes of this facial challenge, the Act subjects Board members to greater supervision than the Coast Guard judges in *Edmond*, whom the Supreme Court held to be inferior officers even though supervision of the judges was fractured between two different bodies, *id.* at 664, and their decisions were not subject to *de novo* review, *id.* at 665. Contrary to the Fund's suggestion, the fact that the Board is charged with exercising extensive authority on behalf of the United States does not mean that Board members must be appointed by the President, for principal as well as inferior officers, by definition, "'exercis[e] significant authority pursuant to the laws of the United States,'" *Freytag v. CIR*, 501 U.S. 868, 881 (1991) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)); *see also Edmond*, 520 U.S. at 662. Instead, what is key under the *Edmond* analysis is the fact that Board members "have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers," *Edmond*, 520 U.S. at 665. The Act vests a broad range of duties in the Board, 15 U.S.C. § 7211(c), but its exercise of those duties is subject to check by the Commission at every significant step.

Board members are also subject to greater oversight than the Independent Counsel in *Morrison v. Olson*, 487 U.S. 654, 662 (1988). Whereas the Act specifies that every decision of the Board is "subject to action by the Commission," 15 U.S.C. § 7211(c), the Ethics in Government Act vested the Independent

Counsel with "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice," 28 U.S.C. § 594(a). Still the Supreme Court adjudged that the Independent Counsel was an inferior officer. *Morrison*, 487 U.S. at 671. The Board's ability to act independently is dwarfed by the "independent discretion [of the Independent Counsel] to exercise the powers delegated to her under the [Ethics in Government] Act," *Morrison*, 487 U.S. at 671.[3]

The Fund is incorrect in suggesting that the Commission's review authority of Board rules and regulations is "severely circumscribed," Appellants' Br. at 34. The Act provides that the Commission "shall approve a proposed rule, if it finds that the rule is consistent with the requirements of this Act and the securities laws, or is necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 7217(b)(3). This provision does not, as the Fund offers, establish a deferential, *Chevron*-like review but reflects an intent to require the Commission itself to determine whether Board rules are consistent with the statutes *and* the public interest. Given the Commission's several statutory

---

[3] *Morrison* presents a significant obstacle to our dissenting colleague's proposed test for inferior officer status, Dis. Op. at 45-46, because the Independent Counsel had broad final decision-making authority unchecked by any other Executive officer. The dissent's attempt to limit *Morrison* to situations in which the office is temporary, *id.* at 45 n.17, ignores the fact that the Supreme Court has rejected the interpretation of *Morrison* as a bright-line test, *see Edmond*, 520 U.S. at 661. But even assuming that the temporariness of the position was the linchpin in view of the Independent Counsel's extraordinarily broad powers, the Supreme Court has never suggested that *Morrison* has no relevance to the inferior officer analysis for offices that, while not temporary, possess powers that are significantly more constrained. Inconvenient precedent is not so easily disposed of.

responsibilities, the Fund's approach would sanction flouting one statutory goal in service of another, an untenable interpretation of congressional intent where the goals can be reconciled. *Cf. Richards v. United States*, 369 U.S. 1, 11 (1962). Moreover, in *Edmond* the Supreme Court held that the "limitation upon review does not . . . render the judges of the Court of Criminal Appeals principal officers." 520 U.S. at 665. The Fund ignores that the Commission's regulatory control does not end with its review of Board rules. The Act empowers the Commission to abrogate or amend Board rules "to assure the fair administration of the [Board], conform the rules promulgated by that Board to the requirements of title I of the [Act], or otherwise further the purposes of that Act, the securities laws, and the rules and regulations thereunder applicable to that Board." 15 U.S.C. § 7217(b)(5). The Commission itself is also empowered to promulgate rules in furtherance of the Act. *Id.* § 7202(a). These powers are inimical to *Chevron*-like deference.

To the extent the Fund suggests that the for-cause limitation on the Commission's removal power requires Board members to be deemed principal officers, it overinflates the importance of removal authority. Recognizing that "[t]he power to remove officers . . . is a powerful tool for control," *Edmond* 520 U.S. at 664, the Supreme Court has indicated that courts should consider removal authority as one factor in determining whether an official is an inferior officer, *id.* at 666.[4]

---

[4] Our dissenting colleague's reading of *Edmond* to mean that at-will removal authority is "the key initial question," Dis. Op. at 42, is curious in light of the Supreme Court's cursory consideration of this factor in determining that the Coast Guard judges were inferior officers, *see Edmond*, 520 U.S. at 664, 666. As the dissent acknowledges, at-will removal authority is not the linchpin of the analysis; rather, an officer is inferior as long as he is "statutorily

The Court has held that both the Coast Guard Judges in *Edmond*, who were subject to the Judge Advocate General's at-will removal authority, 520 U.S. at 664, and the Independent Counsel in *Morrison*, who was subject to removal only for cause, 487 U.S. at 663, were inferior officers. Here, the Act vests removal authority in the Commission, providing that "[a] member of the Board may be removed by the Commission from office, in accordance with section [107(d)(3)], for good cause shown." 15 U.S.C. § 7211(e)(6).[5] Just as in *Morrison*, "the fact that [Board members] can be removed by the [Commission] indicates that [they are] to some degree 'inferior' in rank and authority," 487 U.S. at 671.

The Supreme Court has expressly permitted legislatively-imposed limitations on executive officers' removal authority:

> We have no doubt that when congress, by law, vests the appointment of inferior officers in the heads of

---

subject to direction and supervision in all significant activities." Dis. Op. at 48. Here every significant Board function is subject to significant Commission oversight. *See supra* pp. 9-10.

[5] Section 107(d)(3) provides that the Commission may remove a Board member upon finding that the member

> (A) has willfully violated any provision of this Act, the rules of the Board, or the securities laws; (B) has willfully abused the authority of that member; or (C) without reasonable justification or excuse, has failed to enforce compliance with any such provision or rule, or any professional standard by any registered public accounting firm or any associated person thereof.

15 U.S.C. § 7217(d)(3).

> departments, it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed. The head of a department has no constitutional prerogative of appointment to offices independently of the legislation of congress, and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto.

*United States v. Perkins*, 116 U.S. 483, 485 (1886). In *Myers v. United States*, 272 U.S. 52 (1926), the Court reaffirmed that "Congress, in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal," *id.* at 161, although not to the point of requiring  Senate approval of removals, *id.* at 164; *see also Bowsher v. Synar*, 478 U.S. 714, 726 (1986).

Moreover, the Fund can point to no case prescribing the ways in which Congress can restrict a principal officer's removal of his inferiors.  The opinion of the Justice Department's Office of Legal Counsel ("OLC"), 17 U.S. Op. Off. Legal Counsel 150, 156-57 (1993), relied on by the Fund, concluded only that "jointly" vesting removal authority in a cabinet secretary and the council whose members were themselves subject to removal could pose constitutional problems. Like the Attorney General in *Morrison* and the Judge Advocate General in *Edmond*, the Commission has sole removal authority under the Act.  For purposes of this facial challenge, the arguably more restrictive for-cause removal cannot be dispositive because, as the district court concluded, the Commission could broadly interpret its removal authority in

order to ensure that the Board conforms to its policies.

Finally, our dissenting colleague's two-part test for determining inferior officer status, Dis. Op. at 45-46, sets up a new paradigm in order to reach a desired result. Nothing in *Edmond* suggests that "direct[ion] and supervis[ion] *at some level,*" 520 U.S. at 663 (emphasis added), necessitates "manag[ing] the ongoing conduct," Dis. Op. at 46, of every day-to-day function. Surely both the Coast Guard judges in *Edmond* and the Independent Counsel in *Morrison* would have failed such a narrow test. But even under the terms of this novel test, the Act survives scrutiny. Indeed, the Act commands that *all* of the Board's duties are "subject to action by the Commission." 15 U.S.C. § 7211(c). As in *Edmond*, any sanctions imposed by the Board are "subject to review by the [Commission] before the decisions t[ake] effect on the accused," Dis. Op. at 41; *see* 15 U.S.C. §§ 7215(e)(1), 7217(c)(2). Additionally, the Commission's broad authority under the Act contradicts the dissent's position that the Board's decisions regarding "inspections, investigations, and enforcement actions" cannot be "prevent[ed][,] affirmatively command[ed], and manage[d]" by the Commission, Dis. Op. at 46. First, the Act requires the Board to inspect all registered public accounting firms in accordance with a predetermined schedule, 15 U.S.C. § 7214(b); the Board lacks discretion not to inspect a particular firm. Each inspection yields an inspection report, 15 U.S.C. § 7214(g), and each firm may seek Commission review of its inspection report, *id.* § 7214(h). Therefore, to the extent the inspection report forms the basis for a subsequent investigation by the Board, the Board's determination is subject to Commission approval. Second, although it has the power to do so, *see id.* § 7202(a), the Commission need not "affirmatively command" an investigation, Dis. Op. at 46, given that the Act preserves the Commission's own authority to take administrative or disciplinary action against a firm, 15 U.S.C.

§ 7202(c)(3). The fact that the Commission's investigative authority remains intact is consistent with the role of the Board as a specialized component of the Commission that exercises authority for purposes of efficiency and convenience but cannot usurp it. Third, and most important, because the Board must establish by rule "fair procedures for the investigation and disciplining" of accounting firms and individuals, *id.* § 7215(a), and "[n]o rule of the Board shall become effective without prior approval of the Commission," *id.* § 7217(b)(2), the Commission is empowered to modify the Board's investigative authority as it sees fit and may mandate that all decisions regarding investigation or enforcement actions against a firm be approved by the Commission. *See also id*. § 7271(d)(2). While the Board may adjust the inspection schedule, it may do so only by rule, *id*. § 7214(b)(2), and all Board rules are subject to Commission approval. So too for the Board's investigative authority, *see id.* § 7215(b)(1). Certainly the Commission's authority to "promulgate such rules and regulations[] as may be necessary or appropriate in the public interest or for the protection of investors, and in furtherance of th[e] Act," *id.* § 7202(a), provides ample room for the Commission to tighten its reins on the Board's investigative authority.[6] For purposes of this facial challenge, that the Commission has not chosen to take these steps does not mean that it lacks the authority to do so. If anything, it suggests that the Board has so far acted in

---

[6] In suggesting that the Commission is somehow limited by its statutory obligation to promulgate rules "in furtherance of this Act," Dis. Op. at 50, our dissenting colleague ignores that the Act's purpose in establishing the Board was "to protect the interests of investors and further the public interest," 15 U.S.C. § 7211(a), and therefore Congress contemplated that the goals of the Act and the public interest would go hand in hand. If the public interest demands increased micromanaging of Board operations, the Act empowers the Commission to respond accordingly.

accordance with Commission policy.

Because the Board's exercise of its powers under the Act is subject to comprehensive control by the Commission and Board members are accountable to and removable by the Commission, we hold that Board members are inferior officers.

**B.**

The Fund's alternative contention, assuming Board members are inferior officers, that the Commission is not a department and the Commissioners are not the head of the Commission, is also unpersuasive.

1. As used in the Appointments Clause, the phrase "'Heads of Departments' . . . suggests that the Departments referred to are themselves in the Executive Branch or at least have some connection with that branch." *Buckley*, 424 U.S. at 127. The Supreme Court has explained that "Departments" refers to "the subdivision of the power of the Executive into departments, for the more convenient exercise of that power." *United States v. Germaine*, 99 U.S. 508, 510 (1878). In *Freytag*, the Supreme Court described Departments as being "*like* the Cabinet-level departments," 501 U.S. at 886 (emphasis added), which are "limited in number and easily identified," *id.* Although the Court did not identify the precise characteristics of "Cabinet-like" departments and reserved the issue of whether independent agencies are departments, *id.* at 887 n.4, four Justices urged that "Departments" should be understood to encompass "all agencies immediately below the President in the organizational structure of the Executive Branch," including "all independent executive establishments," *id.* at 918-19 (Scalia, J., joined by O'Connor, Kennedy, and Souter, JJ, concurring in part and in the judgment) (hereinafter "Concurring Op."). They reasoned that the Framers "chose the word 'Departmen[t]' . . . not to connote size or function (much less Cabinet status), but separate

organization – a connotation that still endures even in colloquial usage today." *Id.* at 920. Noting that the Constitution makes no reference to the term "Cabinet," *id.* at 916-17, and that the Court has not held that "'the Heads of Departments' are Cabinet members," *id.* at 917, the concurring justices observed that even the sparse history of the Appointments Clause included the 1792 Act creating a Post-Master General, who, while not a cabinet member, had power to appoint an assistant and deputies, *id.* As Congress has continued to empower non-Cabinet officers to appoint inferior officers, *id.* at 918, the concurring justices cautioned that to conclude such action violated the Appointments Clause would "cast[] into doubt the validity of many appointments and a number of explicit statutory authorizations to appoint," *id.*

The Commission is "Cabinet-like" because it exercises executive authority over a major aspect of government policy, and its principal officers are appointed by the President with the advice and consent of the Senate, 15 U.S.C. § 78d(a), and subject to removal by the President, *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988). Given the constitutionality of independent agencies, *see Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935), such entities must be able to constitutionally exercise appointment authority to permit their proper functioning. As the Attorney General opined in concluding that the Civil Service Commission was a "Department[]" under the Appointments Clause, the Commission here is "not a subordinate Commission attached to one of the so-called executive departments but is in itself an independent division of the Executive Branch of the Government with certain independent duties and functions." 37 U.S. Op. Att'y Gen. 227, 231 (1933). In 1996, the OLC further stated that Congress may "vest the power to appoint inferior officers in the heads of the so-called independent agencies." 20 Op. Off. Legal Counsel 124, 152 (1996). Congress has

authorized the Commission to appoint officers and employees, 5 U.S.C. § 4802(b), and it would be illogical to handicap its ability to effectuate its statutory mandate because of the very independence that Congress has deemed necessary and the Supreme Court has deemed constitutional.

2.  The Commissioners as a group exercise the same final authority as is vested in a single head of an executive department.   Congress has vested "the Commission" with rulemaking, investigative, and adjudicatory authority. *See, e.g.*, 15 U.S.C. § 7202.   Just as independent agencies are "Departments" capable of receiving appointment powers even though they are structured to give the President less control over their functioning, *see Freytag*, 501 U.S. at 919 (Concurring Op.), the heads of independent agencies need not be wholly controlled by the President as long as they are principal officers appointed (with the advice and consent of the Senate) and removable by the President.  All three branches of government are in agreement that the head of an agency can be a multi-member body.   The Attorney General's opinion in 1933 acknowledged that the Civil Service Commission is "headed by" its commissioners.   37 U.S. Op. Att'y Gen. at 228. Congress enacted  the Reorganization Act of 1949, 5 U.S.C. § 904, providing that a Presidential plan for Congressional approval can "provide that the head of an agency be an individual or a commission or board with more than one member."  The Ninth Circuit held in *Silver v. United States Postal Service*, 951 F.2d 1033 (9th Cir. 1991), that the nine governors of the Postal Service constituted its "Head[]," concluding that "[t]he fact that the Postal Service is not structured like a traditional government agency need not imply that its structure is not constitutionally permissible," *id.* at 1037, and that as to appointment, removal and decisionmaking, "Congress carefully vested ultimate control and authority of the Postal Service in the Governors," *id.* at 1038.  The same is true

here. Congress, in the Act as well as the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, vested authority in "the Commission" to promulgate rules, initiate investigations, sue to enjoin violations of securities laws, review disciplinary sanctions, appoint Board members, approve Board rules and the Board's budget, and censure and remove Board members.

The historical sources relied on by the Fund regarding the "benefits of lodging the appointment power in a single individual," Appellants' Br. at 39 (citing THE FEDERALIST No. 76 and 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 1522 (1833)), address a different question, namely the decision to vest appointment of principal officers in the President, and the Framers entrenched that preference in Article II, § 2, cl. 2. The Fund has pointed to no authority wherein the Framers foreclosed Congress from granting multi-member commissions authority to appoint inferior officers. The dictionary is of no assistance because a definition of a "head" as "one who has the first rank or place," Appellants' Br. at 39-40 (quoting NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)), does not resolve whether the "one" must be one person rather than one committee.

Finally, in urging that the Chairman of the Commission is its "Head[]" and therefore the Act's grant of Commission appointment power is invalid, the Fund's authorities do not support its conclusion. While the Postmaster General in *Silver* was an inferior officer appointed and removable by the nine governors, *see* 951 F.2d at 1040, the Chairman is not inferior to the Commission but rather is simply one commissioner who has additional administrative functions. Just as the Chairman has no power to remove another commissioner, the Commission as a whole may neither appoint nor remove one of its own. Moreover, the Reorganization Act addressed in *Silver* mandated that the head of an agency be either a civil service position or

subject to Presidential appointment with the advice and consent of the Senate, 5 U.S.C. § 904; the Chairman is neither, as the President alone selects a Chairman from among the Commissioners. Reorganization Plan No. 10, § 3, 64 Stat. 1265, 1266 (1950). Additionally, although the Chairman has authority to appoint and supervise personnel pursuant to Reorganization Plan No. 10 of 1950, the Chairman does not have sole appointment authority under the Plan; rather "[t]he appointment by the Chairman of the heads of major administrative units under the Commission shall be subject to the approval of the Commission." Reorganization Plan No. 10, § 1(b)(2), 64 Stat. at 1266 (1950); *see United States v. Hartwell*, 73 U.S. (6 Wall) 385, 393-34 (1867); *Nat'l Treasury Employees Union v. Reagan*, 663 F.2d 239, 246 n.9 (D.C. Cir. 1981).

Because Board members are inferior officers of the Commission, which is a "Department[]" whose "Head[]" consists of the several Commissioners, we hold that Title I of the Act creating the Board does not violate the Appointments Clause.

## IV.

Although not expressly included in the Constitution itself, the principle of separation of powers is implicit in the first three articles of the Constitution that define separate roles for the legislative, executive, and judicial branches. *See Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.*, 337 U.S. 582, 591 (1949); *Kilbourn v. Thompson*, 103 U.S. 168, 190 (1880).[7]

---

[7] This principle has been more recently reaffirmed by the Supreme Court in a series of opinions interpreting the President's Article II powers. *See Boumediene v. Bush*, 128 S. Ct. 2229 (2008); *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004).

Considered a bulwark of a just government, *see* THE FEDERALIST No. 47 (James Madison), this principle, however, "by no means contemplates total separation of each of these three essential branches of Government," *Buckley*, 424 U.S. at 121. The Fund does not assert that Congress or the judiciary have directly encroached on the Executive Branch's appointment, removal, or decisionmaking authority by aggrandizing their own powers. Instead, the Fund's separation of powers challenge is premised on the contention that the Act constitutes an excessive attenuation of Presidential control over the Board. The crux of the Fund's challenge – that the double for-cause limitation on removal makes it impossible for the President to perform his duties – is a question of first impression as neither the Supreme Court nor this court has considered a situation where a restriction on removal passes through two levels of control. But the Fund's categorical, bright-line approach conflicts with the Supreme Court's case-specific reasoning in *Morrison*, which emphasized that there are "several means of supervising or controlling [Presidential] powers," 487 U.S. at 696. The removal power thus does not operate in a vacuum; rather it is one of several criteria relevant to assessing limits on the President's ability to exercise Executive power.

**A.**

The Supreme Court has long recognized that some types of restrictions on Presidential authority within the Executive Branch are permissible, especially in the case of independent agencies. In *Humphrey's Executor*, the Supreme Court rejected a challenge to the constitutionality of independent agencies in which principal officers were "subject to removal by the President for inefficiency, neglect of duty, or malfeasance in office," rather than at the President's will. 295 U.S. at 623. The Court observed that "to hold that . . . the members of the [Federal Trade Commission] continue in office at the mere will

of the President," *id.* at 626, would thwart Congress's intention that the commission be "nonpartisan" and "independent of executive authority," *id.* at 624-25 (internal quotation marks omitted).

Several decades later, the Supreme Court expanded upon its analysis in *Humphrey's Executor*, concluding that the statute establishing the Independent Counsel did not violate the principle of separation of powers. The Court considered the "two related issues" of restrictions on the President's power to remove and the impact of the Ethics in Government Act as a whole in order to address the "real question" of "whether . . . the President's ability to perform his constitutional duty," *Morrison*, 487 U.S. at 691, to "take Care that the Laws be faithfully executed," U.S. CONST., art. II, § 3, was impeded. Noting the Attorney General's powers to request appointment of the Independent Counsel and to remove her for cause alongside her limited jurisdiction and tenure and lack of policymaking authority, *id.* at 691-92, the Court held that restrictions on the "amount of control or supervision," *id*. at 695, that the President ultimately exercised over the functions of the Independent Counsel were constitutional given the "several means of supervising or controlling the . . . powers that may be wielded," *id*. at 696.

**B.**

As an initial matter, independent agencies such as the Commission by definition enjoy a degree of autonomy in conducting their affairs, including staffing and operations. Yet this independence is not without limits. In addition to the ability to appoint Commissioners, 15 U.S.C. § 78d(a), and remove them for cause, *see Blinder*, 855 F.2d at 681; *see also Wiener v. United States*, 357 U.S. 349 (1958), which removal

power the Supreme Court has interpreted broadly,[8] the President possesses significant additional levers of influence. Most obviously, by appointment of the Commission chairman, who serves at the pleasure of the President and often "dominate[s] commission policymaking," the President can influence Commission policy and control who directs "the administrative side of commission business, select[s] most staff, set[s] budgetary policy, and as a consequence command[s] staff loyalties." Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 591 (1984) (citing DAVID M. WELBORN, GOVERNANCE OF FEDERAL REGULATORY AGENCIES (1977)). "Here the White House connection is often less direct and generally more subtle, but consultation and coordination on general policy issues of national interest naturally occurs." *Id.* (footnotes omitted). Additionally, although statutory as well as political constraints may prevent Presidential dominance in specific decisions, the President is not stripped of overall influence because independent agencies generally require "presidential good will" to obtain budgetary and legislative support, *id.* at 594-95. Various administrative tools provide additional influence to the President; these include centralization of contracting, personnel requirements, and property allocations. *Id.* at 587. "[A]ny assumption that executive agencies and independent regulatory commissions differ significantly or systematically in function, internal or external procedures, or relationships with the rest of government is misplaced." *Id.* at 596.

---

[8] The Supreme Court has held that the restrictions on the President's removal of Commissioners for "inefficiency, neglect of duty, or malfeasance in office" are "very broad and . . . could sustain removal . . . for any number of actual or perceived transgressions." *Bowsher*, 478 U.S. at 729.

In turn, the Commission enjoys both appointment and removal powers over Board members and, most significantly, "Congress has provided sweeping mechanisms to guarantee substantive control by the [Commission] of the Board's use of its powers under the Act." Intervenor's Br. for the United States at 49-50. The Board's status, as a heavily controlled component of an independent agency, is fully congruent with the paradigm laid out in *Humphrey's Executor*.[9] No Board rule is promulgated and no Board sanction is imposed without the Commission's stamp of approval. Indeed, any policy decision made by the Board is subject to being overruled by the Commission. The Act also provides authority for the Commission to limit and to remove Board authority altogether. 15 U.S.C. §§ 7217(d)(1), (2). Additionally, the Act fully preserves the Commission's authority to regulate the accounting profession, set standards, and take any action against a company or individual. *Id.* § 7202(c). "Because the Commission can withdraw or preempt any aspect of the Board's substantive regulatory authority at any time to effectuate the Commission's own understanding of 'purposes of th[e] Act and the securities laws,' no functional concern or constitutional dimension should be raised by the 'good cause' restrictions on its ability to remove particular officers." Intervenor's Br. for the United States at 50 (quoting 15 U.S.C. § 7217(d)(1)). Thus the Act ensures that all Board functions are subject to pervasive

---

[9] Our dissenting colleague wholly misreads both the court's opinion and the Board's brief to suggest that the Board is itself an independent agency. Dis. Op. at 1,3, 30 n.9. Indeed, with that premise the dissent's conclusion that the Board's structure is unconstitutional conveniently follows. But repeatedly referring to the Board as an independent agency, *see, e.g.*, *id.* at 23 & n.7, 24, 26, 30 n.9, 36, 43 & n.16, does not make it so. As explained in Part III above, by statutory design the Board is composed of inferior officers who are entirely subordinate to the Commission and whose powers are governed by the Commission.

Commission control, including approval of its annual budget and supporting fees, 15 U.S.C. § 7219(b), (d).

When assessed in the context of the restrictions on Presidential power upheld in *Morrison*, the President's powers under the Act extend comfortably beyond the minimum required to "perform his constitutionally assigned duties," *Morrison*, 487 U.S. at 696. Although the President does not directly select or supervise the Board's members, the President possesses significant influence over the Commission, which in turn possesses comprehensive control over the Board. By contrast, neither the President nor the Attorney General had the power to appoint the Independent Counsel or the power to control her investigatory or prosecutorial authority. Instead, a three-judge court appointed the Independent Counsel, *Morrison*, 487 U.S. at 661 (citing 28 U.S.C. § 49 (1982 ed., Supp. V)), and defined her jurisdiction, *id.* Whereas the Board cannot appear in court without the Commission's permission, 15 U.S.C. § 7211(f)(1), the Independent Counsel's powers included "'initiating and conducting prosecutions in any court of competent jurisdiction, framing and signing indictments, filing informations, and handling *all aspects of any case*, in the name of the United States,'" *Morrison*, 487 U.S. at 662 (quoting 28 U.S.C. 594(a)(9)) (emphasis added), and hiring staff to do so, *id.* (citing 28 U.S.C. 594(c)). Most importantly, while the Commission retains its full authority under the Act, 15 U.S.C. § 7202(c), the Ethics in Government Act divested the Attorney General of his pre-existing authority and invested it entirely in the Independent Counsel: "[W]henever a matter has been referred to an independent counsel under the [Ethics in Government] Act, the Attorney General and the Justice Department are required to suspend all investigations and proceedings regarding the matter," *Morrison*, 487 U.S. at 662-

63.[10] As designed by Congress, the Independent Counsel possessed significant independence from the President, but the Supreme Court found no separation of powers violation. The statutorily more constrained authority of the Board, when set beside the Independent Counsel's broad powers and independence, falls well within constitutional bounds.[11]

The Fund points to the limited tenure and jurisdiction of the Independent Counsel in *Morrison* as justification for the unchecked powers of the position, but neither the duration of the office nor its prescribed scope operated as significant constraints on the Independent Counsel's exercise of her broad powers. Although the Independent Counsel was a temporary position, neither the President, the Attorney General, nor even the statute itself limited the length of her tenure; rather, the Independent Counsel determined when her statutory duties were complete, *id.* at 664. The Independent Counsel's time in office, thus, was "rather indefinite and expected to last for multiple years." 31 Op. Off. Legal Counsel, at *34 (Apr. 16, 2007). Moreover, the Independent Counsel's powers were arguably

---

[10] Thus, the Independent Counsel "possessed core and largely unchecked federal prosecutorial powers, effectively displacing the Attorney General and the Justice Department within the counsel's court-defined jurisdiction, which was not necessarily limited to the specific matter that had prompted [her] appointment." 31 Op. Off. Legal Counsel, at *34 (Apr. 16, 2007).

[11] Even viewing *Morrison* as authorizing a "significant intrusion" on the Executive power, Dis. Op. at 21, because the Board is subject to much greater Executive control than the Independent Counsel, the Board would withstand constitutional scrutiny if the Independent Counsel had not. The "sky is falling" approach to the Board's separation of powers implications is an exaggerated response to a relatively insignificant innovation. *Morrison* was the proverbial mountain; the present case, by comparison, is a molehill.

less delimited than the Board's insofar as she could request expansion of her prosecutorial jurisdiction. *See Morrison*, 487 U.S. at 667; 28 U.S.C. § 593(c). Not only is the Board subject to statutorily-defined jurisdictional boundaries, but also the Commission is empowered to further limit the Board's functions, 15 U.S.C. § 7217(d)(2). To the extent the Fund maintains that the breadth of the Independent Counsel's powers was justified by exceptional circumstances, the circumstances leading to the enactment of the Independent Counsel statute are far from unique; as in the case of the Board, Congress identified the need for an entity within the Executive Branch and determined that some limitations on Presidential power were advisable. *See supra* n.1.

More directly, the Act's attenuation of the President's removal power of Board members does not mean, as the Fund contends, that the President's ability to carry out his Executive responsibility is therefore unconstitutionally restricted. Although the principal officer in *Morrison* – the Attorney General – served at the pleasure of the President, nothing in *Morrison* suggests that Congress cannot restrict removal of inferior officers in independent agencies as well as executive agencies.[12] The Supreme Court instead underscored that the animating concern of the Court's removal-power cases is not formal but functional:

> The analysis . . . is designed not to define rigid categories of those officials who may or may not be

---

[12] Our dissenting colleague's assertion that *Morrison* "all but resolves the removal issue in this case" so as to "require[] invalidation of the [Board]," Dis. Op. at 25-26, is remarkable in light of the fact that in *Morrison* the Supreme Court did not purport to establish what removal restrictions would "completely strip[]" the President of removal authority, 487 U.S. at 692.

removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II.

487 U.S. at 689-90. The Court stated that, as regards an inferior officer, "we cannot say that the imposition of a 'good cause' standard for removal by itself unduly trammels on executive authority." *Id*. at 691. So too here, the President is not, as the Fund contends, "completely stripped" of his ability to remove Board members: Like-minded Commissioners can be appointed by the President and they can be removed by the President for cause, and Board members can be appointed and removed for cause by the Commissioners. Although the level of Presidential control over the Board reflects Congress's intention to insulate the Board from partisan forces, this statutory scheme preserves sufficient Executive influence over the Board through the Commission so as not to render the President unable to perform his constitutional duties.[13]

---

[13] The Fund's suggestion that the Board's creation represents an effective diminution of Executive Branch power or an unprecedented Congressional innovation is also unavailing. The Commission's wide-ranging oversight over the Board was modeled after the rules regarding Commission authority over self-regulatory organizations ("SROs") in the securities industry, which have existed for over seventy years, *NASD*, 431 F.3d at 804, such as the New York Stock Exchange and the National Association of Securities Dealers, 15 U.S.C. § 7217(a); S. Rep. No. 107-205, at 12. A main difference – Board members are appointed by the Commission, whereas the government plays no formal role in the selection of SRO board members – means that the Board's grant of governmental authority is duly accompanied by government accountability. Consequently, the Fund's characterization of the Commission's review of Board action as "highly deferential," "severely restricted," and "severely

Our dissenting colleague asks why the Board is removable only for cause, Dis. Op. at 51, concluding that it is to preserve the Board's independence of the Commission. But for-cause removal is not the end of the constitutional inquiry. We might ask in return, why has Congress granted such pervasive Commission authority over the Board if not to preserve the means of Executive control? Indeed, why would Congress deny the Commission at-will removal authority on the one hand and then provide the Commission with the authority to abolish Board powers on the other, essentially granting at-will removal power over Board functions if not Board members? Certainly the latter power blunts the constitutional impact of for-cause removal. Even if these statutory provisions may reveal a legislative compromise, the Act as a whole provides ample Executive control over the Board. If, as the dissent posits, the for-cause removal provision reflects Congress's intention to grant "some degree of substantive independence" to the Board, *id.* at 34, that independence is undercut by the vast degree of Commission control at every significant step. To the extent the dissent offers that the Commission cannot have broad rulemaking authority to circumscribe the Board's investigative actions because "such authority would all but destroy the 'independence'" that the for-cause removal provision might otherwise allow, *id.* at 49; *see id.* at 34-35 (citing legislative history), such is the statute as written by Congress.

The Fund's contention that the Act violates separation of powers because the removal restrictions go beyond the "good cause" standard approved in *Morrison* fares no better. The Fund contends that under the Act "the [Commission] cannot remove a Board member who incompetently pursues wrong-

circumscribed," Appellants' Br. 7, 33, 34, is difficult to reconcile with the Act, much less with this court's analysis of the same statutory review provisions for SROs in *NASD*, 431 F.3d at 806.

headed policies, but permits, at most, removal only of those members who egregiously and deliberately flout their duties or engage in serious misconduct." Appellants' Br. at 21. The Supreme Court has never specified that "good cause" is the greatest restriction Congress may impose on removal of inferior officers. In fact, the Court has broadly stated that Congress "may limit and restrict the power of removal as it deems best for the public interest." *Perkins*, 116 U.S. at 483. Furthermore, it is far from clear that the Commission would share the Fund's cramped interpretation of its removal authority. *Cf. supra* n.8. While the Fund points to the fact that two of the three provisions that authorize removal of Board members refer to actions taken "willfully," *see supra* n. 5, the meaning of that word "is often being influenced by its context," *Spies v. United States*, 317 U.S. 492, 497 (1943), and the Fund points to no basis for assuming that the Commission would view 15 U.S.C. § 7217(d)(3) as necessarily defining the exclusive circumstances in which removal for "good cause" may be established, *see Bowsher*, 478 U.S. at 729; *cf. Wonsover v. SEC*, 205 F.3d 408, 413-14 (D.C. Cir. 2000).

## V.

"[F]acial challenges are disfavored" precisely because they do not permit the Executive Branch to attempt to "implement[] [statutes] in a manner consonant with the Constitution," *Wash. State Grange*, 128 S. Ct. at 1191, and the Fund's challenge does not present the occasion for the court to announce a bright-line rule regarding removal restrictions.[14] Consistent with the court's

---

[14] Contrary to our dissenting colleague, Dis. Op. at 35-36 n.12, the fact that this is a facial challenge significantly affects the analysis, for the Fund bears a heavy burden to demonstrate that the Act unduly constrains the President's ability to see that the laws are faithfully executed in *all* circumstances and *cannot* be constitutionally

duty to construe statutes to avoid constitutional infirmity, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986), there is no basis to conclude that the Commission's removal authority does not satisfy Article II requirements, *cf. Morrison*, 487 U.S. at 682. The Fund's focus on the removal limitations ignores the statutory context, which empowers the Commission not only to oversee all significant Board activities through *ex ante* controls and *ex post de novo* review but also to "withdraw or preempt any aspect of the Board's substantive regulatory authority," Intervenor's Br. for the United States at 50, thus mitigating concern regarding the scope of the removal restrictions. The Act additionally preserves all of the Commission's authority in the field while enhancing Executive control in an area previously left largely in private control. *See supra* n.13.

Nor does our dissenting colleague's philosophical approach undermine either the court's logic or view of the law. While the fundamental purposes of the Appointments Clause and the principle of separation of powers are undisputed, the constitutional question for this court requires that we take instruction from Supreme Court precedent as we find it and understand that the absence of a precise precedent is neither the end of the inquiry – the statutory scheme in *Morrison*, for example, was also novel – nor grounds for failing to address Congress' statutory scheme as it is written. Our dissenting colleague's analysis, cloaked in textualist garb, construes Supreme Court precedent to support his theory instead of acknowledging its limits; for example, the intrusion by Congress upon the President's removal authority in *Myers* is far removed

---

applied, *see supra* p.6. In making that determination, the court must look at the extent of the Commission's authority under the Act, not to whether and how it has exercised that authority, *see* Dis. Op. at 51 n.23.

from what is at issue here, and the Court's multi-factor analysis in *Edmond* does not fit the dissent's novel two-step paradigm. The absolutes that the dissent postulates – essentially, either the President must have at-will removal power or Congress has acted unconstitutionally – are inconsistent with the Supreme Court's more nuanced approach in addressing limitations on the President's appointment authority and separation of powers. In the face of a comprehensive statutory scheme that provides exhaustive means of Executive control and oversight, the dissent misrepresents the Board as an independent agency with final Executive authority, *see supra* n.9, interprets the Commission's powers of oversight narrowly, *see* Dis. Op. at 48-51, 51 n.23, and the limitations attendant to for-cause removal broadly, *see id.* at 31-35, divorced from their statutory context in a manner to create constitutional problems where there are none; and misreads Supreme Court precedent to portend doom for the unitary Executive. But those fears have no statutory basis, for our dissenting colleague can cite to no instance in which the Board can make policy that the Commission cannot override.[15]

Given the constitutionality of independent agencies and the Commission's comprehensive control over the Board, the Fund cannot show that the statutory scheme so restricts the President's control over the Board as to violate separation of powers. The bulk of the Fund's challenge to the Act was fought – and lost – over seventy years ago when the Supreme Court decided

---

[15] To the extent our dissenting colleague asserts both that overturning the Act would have no impact on other independent agencies, Dis. Op. at 5-6, and that failing to overturn the Act would produce a parade of horribles were Congress to adopt a double-for-cause approach generally, *id.* at 28, again he ignores the statutory scheme in a singular focus on the removal power. If that is to be the Supreme Court's approach, then it must say so for its precedent is more nuanced and takes account of the statute as a whole.

*Humphrey's Executor*. At that time, the Court concluded that the concept of a unitary Executive embodied in the Constitution does not require the President to have an alter ego (i.e., an official serving at the pleasure of the President and removable at will) within independent agencies. The Court reiterated the conclusion that neither for-cause removal nor substantial independent discretion eviscerates Executive control in *Morrison*. The key question the Supreme Court requires this court to answer is whether the Act so limits the President's ability to influence the Board as to render it unconstitutional. Because of the reality of the President's broad-ranging authority under the Act, the Fund's facial challenge fails.

Accordingly, we hold that the Fund's facial challenge to Title I of the Act fails to reveal violations of the Appointments Clause or separation of powers, and we affirm the grant of summary judgment to the Board and the United States.

KAVANAUGH, *Circuit Judge*, dissenting: This case raises fundamental questions about the scope of the President's constitutional power to appoint and remove officers in the Executive Branch. Article II begins: "The executive Power shall be vested in a President of the United States of America." Under Article II, the President possesses the sole power and responsibility to "take Care that the Laws be faithfully executed." To assist in his duties, the President has authority, within certain textual limits, to appoint and remove executive officers. *Myers v. United States*, 272 U.S. 52, 117 (1926). Disputes over the scope of the President's appointment and removal powers have arisen sporadically throughout American history. This latest chapter involving the Public Company Accounting Oversight Board is the most important separation-of-powers case regarding the President's appointment and removal powers to reach the courts in the last 20 years. *Cf. Morrison v. Olson*, 487 U.S. 654 (1988); *Bowsher v. Synar*, 478 U.S. 714 (1986); *Buckley v. Valeo*, 424 U.S. 1 (1976); *Humphrey's Executor v. United States*, 295 U.S. 602 (1935); *Myers*, 272 U.S. 52.

The Public Company Accounting Oversight Board is an independent executive agency created by the Sarbanes-Oxley Act of 2002. The PCAOB is considered an "independent" agency because the five members of the PCAOB are removable only for cause, not at will. The PCAOB portrays itself as just another independent executive agency – like the FCC, the FTC, and the NLRB – that is permissible under the Supreme Court's 1935 decision in *Humphrey's Executor*. Plaintiffs, including a Nevada accounting firm regulated by the Board, strenuously disagree and challenge its constitutionality. Plaintiffs object to the fact that members of the PCAOB are appointed by and removable for cause by another independent agency, the Securities and Exchange Commission, rather than by the President. They argue that this structure, an independent agency appointed by and removable only for cause by another independent agency:

(i) interferes with the President's Article II authority to remove executive officers, and thereby exercise the executive power and take care that the laws be faithfully executed; and (ii) violates the specific terms of the Appointments Clause of Article II regarding the President's authority to appoint "principal officers" in the Executive Branch. Plaintiffs contend that "vesting government agencies with coercive power over the citizenry, and simultaneously depriving the citizenry of any ability to control or check those exercising such potentially tyrannical authority, is precisely the fundamental threat to the 'liberty and security of the governed' that separation of powers principles were designed to prevent." Plaintiffs' Br. at 10-11 (quoting *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991)).

On the removal issue, the majority opinion views this case as *Humphrey's Executor* redux. But this case is *Humphrey's Executor* squared. There is a world of difference between the legion of *Humphrey's Executor*-style agencies and the PCAOB: The heads of the *Humphrey's Executor* independent agencies are removable for cause *by the President*, whereas members of the PCAOB are removable for cause only *by another independent agency, the Securities and Exchange Commission*. The President's power to remove is critical to the President's power to control the Executive Branch and perform his Article II responsibilities. Yet under this statute, the President is two levels of for-cause removal away from Board members, a previously unheard-of restriction on and attenuation of the President's authority over executive officers. This structure effectively eliminates any Presidential power to control the PCAOB, notwithstanding that the Board performs numerous regulatory and law-enforcement functions at the core of the executive power. So far as the parties, including the United States as intervenor,

have been able to determine in the research reflected in their exhaustive and excellent briefs, never before in American history has there been an independent agency whose heads are appointed by and removable only for cause by another independent agency, rather than by the President or his alter ego.[1]  But that is the case with PCAOB members, who are removable for cause only by the SEC – and it is undisputed that the SEC as an independent agency is not the President's alter ego.  The PCAOB thus goes well beyond what historical practice and *Humphrey's Executor* authorize.

The PCAOB's structure not only exceeds the boundaries of *Humphrey's Executor*; it also contravenes specific and critical language in the Supreme Court's 1988 decision in *Morrison v. Olson.*  The Supreme Court allowed for-cause removal of the independent counsel in *Morrison* only because the President through his alter ego (the Attorney General) still retained the authority to remove the independent counsel.  Therefore, the Court emphasized, *Morrison* was "not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the 'faithful execution' of the laws."  487 U.S. at 692.  This *is* such a case.  The

---

[1] By the President's "alter ego," I mean the head of a department who is removable at will by the President, such as the Attorney General or the Secretary of the Treasury.  The Supreme Court has recognized that when the head of a department appoints inferior officers in that department, the President technically exercises his removal authority over those inferior officers through his alter ego, the department head.  *See Myers*, 272 U.S. at 133 (referring to "alter ego" of President); *Morrison*, 487 U.S. at 692 (describing Attorney General as President's alter ego for removal of inferior officer by Attorney General); *Ex parte Hennen*, 38 U.S. 230, 259-60 (1839).

President has no ability to remove the PCAOB members, either directly or through an alter ego.

The statute's violation of the Appointments Clause is also plain. Under Article II as interpreted in *Edmond v. United States*, 520 U.S. 651 (1997), the PCAOB members are principal officers who must be appointed by the President with the advice and consent of the Senate. They are not inferior officers because they are not "directed and supervised" by the SEC, *id.* at 663: The PCAOB members are not removable at will by the SEC; the SEC does not have statutory authority to remove them for failure to follow substantive SEC direction or supervision; and the SEC does not have statutory authority to prevent and affirmatively command, and to manage the ongoing conduct of, Board inspections, Board investigations, and Board enforcement actions. Moreover, as the statutory text demonstrates, the very purpose of this statute was precisely to create an accounting board that would operate with some substantive independence from the SEC, not one that would be "directed and supervised" by the SEC. *See, e.g.*, 15 U.S.C. §§ 7211(c), 7214, 7215, 7217; *see also* S. Rep. No. 107-205, at 6 (2002) ("The successful operation of the Board depends upon its independence . . . ."); 148 CONG. REC. S6327, S6331 (daily ed. July 8, 2002) (statement of Sen. Sarbanes) ("[W]e need to establish this oversight board . . . to provide an extra guarantee of its independence . . . ."). Because PCAOB members are principal officers under the *Edmond* test, they must be appointed by the President with the advice and consent of the Senate. The Board members are appointed by the SEC alone; therefore, the statute violates the Appointments Clause as well.

The two constitutional flaws in the PCAOB statute are not matters of mere etiquette or protocol. By restricting the

President's authority over the Board, the Act renders this Executive Branch agency unaccountable and divorced from Presidential control to a degree not previously countenanced in our constitutional structure. This was not inadvertent; Members of Congress designed the PCAOB to have "massive power, unchecked power." 148 CONG. REC. at S6334 (statement of Sen. Gramm). Our constitutional structure is premised, however, on the notion that such unaccountable power is inconsistent with individual liberty. "The purpose of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom." *Morrison*, 487 U.S. at 727 (Scalia, J., dissenting); *see also Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."). The Framers of our Constitution took great care to ensure that power in our system was separated into three Branches, not concentrated in the Legislative Branch; that there were checks and balances among the three Branches; and that one individual would be ultimately responsible and accountable for the exercise of executive power. The PCAOB contravenes those bedrock constitutional principles, as well as long-standing Supreme Court precedents, and it is therefore unconstitutional.

Although the constitutional violations here are serious, two points are important to bear in mind. First, finding the PCAOB unconstitutional would not itself call into question the many other independent agencies that dot Washington, D.C. The heads of those agencies are appointed by and removable for cause *by the President*, the precise structure that *Humphrey's Executor* upheld and that is conspicuously missing from the PCAOB statute. In other words, the PCAOB is uniquely structured, and a judicial holding

invalidating it would be uniquely limited to the PCAOB. Second, and relatedly, the constitutional flaws here could be easily and quickly corrected. Congress could simply amend the statute to require, for example, that the PCAOB members, like the heads of other agencies, be appointed by the President with the advice and consent of the Senate and therefore be removable by the President. *Cf.* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008) (creating new "independent" federal regulator of Fannie Mae and Freddie Mac appointed by President with advice and consent of Senate and removable for cause by President). Alternatively, Congress could make the Board part of the SEC – directed, supervised, and removable at will by the Commission just like inferior officers in the SEC. In the meantime, however, the Board's structure violates the Constitution of the United States.

I

As the Supreme Court has indicated, it is always important in a case of this sort to begin with the constitutional text and the original understanding, which are essential to proper interpretation of our enduring Constitution. *See Clinton v. City of New York*, 524 U.S. 417, 438-40 (1998); *Edmond v. United States*, 520 U.S. 651, 658-64 (1997); *INS v. Chadha*, 462 U.S. 919, 945-59 (1983); *Buckley v. Valeo*, 424 U.S. 1, 118-37 (1976). The text and original understanding are particularly significant in this case: They properly inform our analysis of the Board's arguments for extending the Supreme Court's 1935 opinion in *Humphrey's Executor* to cover this novel agency structure. I therefore will discuss the text and original understanding at some length.

"If there is a principle in our Constitution . . . more sacred than another, it is that which separates the Legislative,

Executive and Judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (1926) (quoting 1 ANNALS OF CONGRESS 581 (Madison) (1789)). "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Buckley*, 424 U.S. at 124. To protect individual liberty, the Framers did not adopt a parliamentary system with a Prime Minister dependent on the Legislature but instead created a President independent from the Legislative Branch: The President is not selected by the Congress (except in the rare cases when no Presidential candidate wins a majority of the state electors' votes); the President's salary is protected against any congressional diminution; and the President's term in office is fixed, except in cases of impeachment by the House and conviction by two-thirds of the Senate for high crimes and misdemeanors.

Article II of the Constitution addresses the Presidency. Its first 15 words are definitive: "The executive Power shall be vested in a President of the United States of America." U.S. CONST. art. II, § 1, cl. 1. Article II also grants the President the sole authority and duty to "take Care that the Laws be faithfully executed." *Id.* art. II, § 3. Under the text of our Constitution, a single President possesses the entirety of the "executive power" (whatever the scope of that power may be) and the entire authority to take care that the laws be faithfully executed.[2]

---

[2] It is important to distinguish the question of who is responsible for exercising the executive power from the question of the scope of executive power. The fact that a single President is responsible and accountable for exercising the executive power does not mean that the scope of executive power is broad or narrow. *Cf., e.g.*, Neal Kumar Katyal, Hamdan v. Rumsfeld*: The Legal Academy Goes to Practice*, 120 HARV. L. REV. 65, 69 n.16

The Framers established a single President by design: A single head of the Executive Branch enhances efficiency and energy in the administration of the Government. And a single head furthers accountability by making one person responsible for *all* decisions made by and in the Executive Branch. As the Supreme Court has noted, the "insistence of the Framers upon unity in the Federal Executive – to ensure both vigor and accountability – is well known." *Printz v. United States*, 521 U.S. 898, 922 (1997); *see also* THE FEDERALIST NOS. 69, 70, 72, 76 (Hamilton); *Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981); Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2332 (2001) ("The Presidency's unitary power structure, its visibility, and its 'personality' all render the office peculiarly apt to exercise power in ways that the public can identify and evaluate.").

Justice Breyer succinctly summarized the Constitution's provision for a single President: "Article II makes a single President responsible for the actions of the Executive Branch in much the same way that the entire Congress is responsible for the actions of the Legislative Branch, or the entire Judiciary for those of the Judicial Branch. . . . The Founders created this equivalence by consciously deciding to vest Executive authority in one person rather than several. They did so in order to focus, rather than to spread, Executive responsibility thereby facilitating accountability. . . . [T]hese constitutional objectives explain why a President, though able to delegate duties to others, cannot delegate ultimate responsibility or the active obligation to supervise that goes

---

(2006) ("The unitary executive theory merely means that truly executive power is concentrated in the President; the theory alone does not specify what counts as executive power in the first place.").

with it." *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (concurring in judgment).

Of course, "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers*, 272 U.S. at 117. It has been understood since the beginning of the Republic that "Article II grants to the President the executive power of the Government, i.e., the general administrative control of those executing the laws, *including the power of appointment and removal of executive officers* – a conclusion confirmed by his obligation to take care that the laws be faithfully executed." *Buckley*, 424 U.S. at 136 (quoting *Myers*, 272 U.S. at 163-64) (emphasis added).

Under Article II, the President thus necessarily possesses the power to *appoint* executive officers who exercise executive authority delegated by the President and who otherwise advise and assist the President. *See* U.S. CONST. art. II, § 2, cl. 2; *id.* art. II, § 2, cl. 1 (President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices"); *see also* Akhil Reed Amar, *Some Opinions on the Opinion Clause*, 82 VA. L. REV. 647, 660-68 (1996). Reflecting the Framers' careful attention to checks and balances, the text of the Constitution constrains the President's appointment power in certain important respects. In particular, the Appointments Clause provides that the President may appoint the "principal" executive officers – a category that includes at least the heads of departments – only with the advice and consent of the Senate. *See* U.S. CONST. art. II, § 2, cl. 2. In other words, the President does not possess the unilateral power to appoint the Secretary of Defense or Attorney General, for example, but can do so only with Senate concurrence. Senate approval helps prevent the

Presidential appointment of "unfit characters." THE FEDERALIST NO. 76 (Hamilton). Because Senate confirmation of all executive officers could prove cumbersome, however, the Appointments Clause also provides that Congress may by law vest the appointment of "inferior" executive officers in the President alone or the heads of departments, without the need for Senate approval. U.S. CONST. art. II, § 2, cl. 2.

To help direct and supervise executive officers – and thereby to exercise the "executive Power" and "take Care that the Laws be faithfully executed" – the President possesses not just the power to appoint, but also the power to *remove* executive officers. "Made responsible under the Constitution for the effective enforcement of the law, the President needs as an indispensable aid to meet it the disciplinary influence upon those who act under him of a reserve power of removal." *Myers*, 272 U.S. at 132. The moment that the President "loses confidence in the intelligence, ability, judgment or loyalty of any one of them, he must have the power to remove him without delay." *Id.* at 134; *see also* THE FEDERALIST NO. 72 (Hamilton) (executive officers "ought to be considered as the assistants or deputies of the Chief Magistrate . . . and ought to be subject to his superintendence"). "The power to remove officers, we have recognized, is a powerful tool for control." *Edmond*, 520 U.S. at 664. The reason that the power to remove at will translates into the power to control is evident: "Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (quoting *Synar v. United States*, 626 F. Supp. 1374, 1401 (D.D.C. 1986)). If the President were stripped of plenary removal power over, say, the Secretary of Defense or the Attorney General, then the President no longer could fully control and be accountable for the exercise of

executive power, as the Constitution demands. In other words, if Congress could unduly limit the President's ability to remove executive officers, the result would be a fragmented, inefficient, and unaccountable Executive Branch that the President would lack power to fully direct and supervise.

Unlike the President's power to appoint, the President's power to remove officers in the Executive Branch is not limited by the text of the Constitution. And the subject of removing officers in the Executive Branch "was not discussed in the Constitutional Convention." *Myers*, 272 U.S. at 109-10.[3] The issue of removal of executive officers instead was first "presented early in the first session of the First Congress," during consideration of a bill establishing certain Executive Branch offices and providing that the officers would be subject to Senate confirmation and "removable by the President." *Id.* at 109, 111. "Then ensued what has been many times described as one of the ablest constitutional debates which has taken place in Congress since the adoption of the Constitution." *Parsons v. United States*, 167 U.S. 324, 329 (1897). Representative James Madison of Virginia and others argued that Article II provided the President plenary power to remove executive officers, making the reference in the bill unnecessary and misleading surplusage. Madison and his allies "dwelt at length upon the necessity there was for construing Article II to give the President the sole power of removal in his responsibility for the conduct of the executive branch, and enforced this by emphasizing his duty expressly

---

[3] The Constitution provides that all executive and judicial officers of the Federal Government can be removed through the impeachment process, U.S. CONST. art. II, § 4, but that has never been understood to be the exclusive method for removing executive officers other than the President and Vice President. *See Shurtleff v. United States*, 189 U.S. 311, 317 (1903).

declared in the third section of the Article to 'take care that the laws be faithfully executed.'" *Myers*, 272 U.S. at 117 (quoting 1 ANNALS OF CONGRESS 496, 497 (Madison)). As Madison explained, "If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Id.* at 131 (quoting 1 ANNALS OF CONGRESS 499 (Madison)). Madison added: "Is the power of displacing an Executive power? I conceive that if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 ANNALS OF CONGRESS 463 (Madison). This Presidential removal power would preserve "that great principle of unity and responsibility in the Executive department." *Myers*, 272 U.S. at 131 (quoting 1 ANNALS OF CONGRESS 499 (Madison)).

The House ultimately concurred with Madison's understanding and deleted the bill's express reference to the manner of removing the officers so as not to imply that the President's removal power "might appear to be exercised by virtue of a legislative grant only." *Id.* at 112 (quoting 1 ANNALS OF CONGRESS 579). Congress passed the bill, and President Washington signed it into law. President Washington proceeded to assert and use the removal power throughout his Presidency in order to ensure his personal control over and direction of the Executive Branch. *See* Saikrishna Prakash, *Removal and Tenure in Office*, 92 VA. L. REV. 1779, 1827-29 (2006).

Congress's decision – referred to as the "Decision of 1789" – "provides contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the

First Congress had taken part in framing that instrument." *Bowsher*, 478 U.S. at 723-24 (internal quotation marks omitted). As Chief Justice Marshall explained, the Decision of 1789 "has ever been considered as a full expression of the sense of the legislature on this important part of the American constitution." 5 JOHN MARSHALL, THE LIFE OF GEORGE WASHINGTON 200 (1807).

In short, the plain text and original understanding of Article II establish the broad scope of the President's appointment and removal powers. As a leading scholar of the Constitution's text has aptly observed, "What Article II *did* make emphatically clear from start to finish was that the president would be personally responsible for his branch." AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 197 (2005).

II

With that grounding in the constitutional text and the First Congress's Decision of 1789, I turn to the Supreme Court's key precedents interpreting that text and to analysis of the questions presented in this case. In this Part II, I will address the removal power issue. In Part III, I will consider the Appointments Clause question.

A

As explained above, the constitutional text and the original understanding, including the Decision of 1789, established that the President possesses the power under Article II to remove officers of the Executive Branch at will. That original understanding became widely accepted during the first 60 years of the Nation. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 149 (1926) ("[T]he construction given to the Constitution in 1789 . . . may now be considered as firmly

and definitely settled, and there is good sense and practical utility in the construction.") (citing 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW, Lecture 14, at 310). Yet questions over the extent of the President's removal power did not end. The issue came to the fore in the wake of the Civil War and prompted the House of Representatives's impeachment of President Andrew Johnson in 1868. As part of a bitter struggle over Reconstruction, Congress enacted the Tenure of Office Act in 1867, 14 Stat. 430, ch. 154. That law prohibited the President from removing certain Executive Branch officers without the Senate's concurrence. President Johnson contended that the Act was unconstitutional; in defiance of the Act, he removed his Secretary of War without Senate approval. The House of Representatives responded by impeaching President Johnson, which was followed by a narrow Senate acquittal. The contentious Johnson episode ended in a way that discouraged congressional restrictions on the President's removal power and helped preserve Presidential control over the Executive Branch. The Tenure of Office Act was itself repealed in 1887. The Johnson acquittal stands as one of the most important events in American history in maintaining the separation of powers ordained by the Constitution. *See* WILLIAM H. REHNQUIST, GRAND INQUESTS: THE HISTORIC IMPEACHMENTS OF JUSTICE SAMUEL CHASE AND PRESIDENT ANDREW JOHNSON 215-16, 230-31, 250 (1992); *see also Raines v. Byrd*, 521 U.S. 811, 826-28 (1997).

A few decades later in 1897, the Supreme Court considered a case that arose when President Cleveland fired a holdover U.S. Attorney from the Harrison Administration. *See Parsons v. United States*, 167 U.S. 324 (1897). The relevant statute established a four-year term for U.S. Attorneys. A unanimous Court held that the law did not preclude the President from removing the U.S. Attorney at

will, based largely on the constitutional backdrop that necessarily informed interpretation of the statute. The Court said the debates and opinions on the removal power from the Decision of 1789 onward showed a "continued and uninterrupted practice" of unlimited Presidential removal power. *Id.* at 340. "Considering the construction of the Constitution in this regard as given by the Congress of 1789, and having in mind the constant and uniform practice of the Government in harmony with such construction," the Court construed the act as "providing absolutely for the expiration of the term of office at the end of four years, and not as giving a term that shall last, at all events, for that time." *Id.* at 339. The Court accordingly held that recognition that the officials "were removable from office at pleasure was but a recognition of the construction thus almost universally adhered to and acquiesced in as to the power of the President to remove." *Id.*; *see also id.* at 330 ("[T]he decision of Congress in 1789, and the universal practice of the Government under it, had settled the question beyond any power of alteration.").

In *Myers v. United States*, the Supreme Court thoroughly addressed the scope of the President's removal power. *See* 272 U.S. 52 (1926). In an extraordinarily detailed opinion by Chief Justice Taft, who had previously served as President and had a keen understanding of the realities of Executive Branch governance, the Court reaffirmed the Decision of 1789 and agreed with President Johnson's view in 1868 that restrictions on the President's removal power were unconstitutional. *Id.* at 166-67. The dispute in *Myers* arose after President Wilson had removed a postmaster without Senate approval, in violation of an 1872 statute covering the Post Office Department. The postmaster sued. In upholding the President's removal authority and rejecting the postmaster's claim, the Court examined the text and history of

Article II and outlined the broad reach of the President's appointment and removal powers:

> The vesting of the executive power in the President was essentially a grant of the power to execute the laws. . . . As he is charged specifically to take care that they be faithfully executed, the reasonable implication, even in the absence of express words, was that as part of his executive power he should select those who were to act for him under his direction in the execution of the laws. The further implication must be, in the absence of any express limitation respecting removals, that as his selection of administrative officers is essential to the execution of the laws by him, so must be his power of removing those for whom he can not continue to be responsible.

*Id.* at 117. The *Myers* Court said that the President's power of removal over executive officers was "essential to the execution of the laws by him." *Id.* The Court added that the President's removal power extended to officers appointed by the President throughout the Executive Branch, including to officers who are charged with promulgating regulations or exercising "quasi-judicial" duties, such as "members of executive tribunals." *Id.* at 135. And the *Myers* Court made clear that Congress could play no role in the removal of executive officers.

Consistent with the constitutional text and the Decision of 1789, the holding of *Myers* continues to this day to prohibit any congressional involvement in the removal of executive officers. In its 1986 decision in *Bowsher v. Synar*, for example, the Court reaffirmed this precise holding. *See* 478 U.S. 714. The *Bowsher* Court held that Congress had impermissibly "intruded into the executive function" by

preventing the President's removal of an executive officer (the Comptroller General as his duties were then defined) without congressional approval. *Id.* at 734. The Court stated that "Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment." *Id.* at 726.

B

If the removal issue in this case were decided based on the constitutional text, the prevailing understanding of that text at the time of drafting and ratification and during the First Congress, the historical practice and common understanding of that text during the first 146 years of our constitutional Government, and the leading Supreme Court decisions in *Myers* and *Parsons*, we would face an easy decision. The PCAOB would be flatly unconstitutional because the statute restricts the President's power to remove PCAOB members at will and thereby to direct and supervise the exercise of executive power and take care that the laws are faithfully executed.

It's not quite that easy, however. Any decision this Court makes in this area must recognize the central importance of the Supreme Court's 1935 decision in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). The Court there did not overrule the precise holding of *Myers* by allowing congressional involvement in removal of executive officers. But in tension with *Myers*, the Court did uphold congressionally imposed good-cause restrictions on the President's removal of certain executive officers. *Id.* at 631-32.[4] The case arose after a decision by President Franklin

---

[4] Some have questioned the persuasiveness of the constitutional distinction drawn in removal cases between (i) a statute generally requiring the President to meet good-cause

Roosevelt, upon taking office in 1933, to ask for Humphrey's resignation from the Federal Trade Commission. President Roosevelt wrote in a letter to Humphrey, who had been

standards to remove an officer as in *Humphrey's Executor* and (ii) a statute requiring congressional approval of particular removal decisions as in *Myers*. In both cases, the President's power to remove is restricted by an Act of Congress; the for-cause approach arguably just shows, as Madison warned, that Congress can "mask, under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments." THE FEDERALIST NO. 48 (Madison). The apparent theory behind the distinction is that (i) Congressional diminishment of Presidential authority is different from (ii) Congressional diminishment of Presidential authority *and* concurrent enhancement of its own authority. As Justice Kennedy has written for the Court, that theory is not an entirely accurate summary of separation of powers principles: "Even when a branch does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996); *see also Clinton v. Jones*, 520 U.S. 681, 701 (1997) (quoting this language from *Loving* with approval). And as Judge Silberman, writing for himself and Judge Williams, has recognized, the factual basis for the distinction is dubious: "If the President's authority is diminished . . . Congress' political power must necessarily increase vis-a-vis the President." *In re Sealed Case*, 838 F.2d 476, 508 (D.C. Cir. 1988), *rev'd sub nom. Morrison v. Olson*, 487 U.S. 654 (1988); *see also In re Sealed Case*, 829 F.2d 50, 65 n.3 (D.C. Cir. 1987) (Williams, J., concurring in part and dissenting in part) ("Power abhors a vacuum. Unhitching the Independent Counsel from the executive may make the office naturally prone to domination by the branch that represents its primary competitor."); Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2271 n.93 (2001) ("As a practical matter, successful insulation of administration from the President – even if accomplished in the name of 'independence' – will tend to enhance Congress's own authority over the insulated activities.").

appointed by President Hoover: "I do not feel that your mind and my mind go along together on either the policies or the administering of" the FTC. *Id.* at 619. When Humphrey refused to resign, President Roosevelt fired him. Humphrey challenged the removal as a violation of the Federal Trade Commission Act, which provided that the President could remove commissioners during their statutory term of office only for "inefficiency, neglect of duty, or malfeasance in office." *Id.*

The Solicitor General defended President Roosevelt's decision on constitutional grounds by citing *Myers.* Yet the Court ruled for Humphrey. In an opinion by Justice Sutherland, the Court upheld the statutory limits on the President's removal power, allowing the FTC to be "a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Id.* at 625-26 (emphasis omitted). The Court stated that the Constitution permitted Congress to establish independent agencies that "cannot in any proper sense be characterized as an arm or an eye of the executive." *Id.* at 628; *see also Wiener v. United States*, 357 U.S. 349, 355-56 (1958) (relying on *Humphrey's Executor* and upholding removal restrictions on members of War Claims Commission).[5]

*Humphrey's Executor* thereby blessed Congress's creation of the so-called "independent" agencies where "at

---

[5] "The rationale of *Wiener*, which is essentially that *Congress* must have implied a for-cause removal restriction when *the Court* believes that the functions of the agency demand such tenure protection, 357 U.S. at 353-56, seems questionable." *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 168 n.115 (1996).

least one individual is appointed by the President to a full-time, fixed-term position with the advice and consent of the Senate and has protection against summary removal by some form of 'for cause' restriction on the President's authority." Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 ADMIN. L. REV. 1111, 1114 (2000). Today, this collection of independent agencies is commonly understood to include, among many others, the CFTC, the FCC, the Federal Reserve, the FTC, FERC, the NLRB, and the SEC. As the cases and statutes illustrate, what makes an agency "independent" is the for-cause removal restriction that limits the President's ability to remove the heads of the agency – typically to cases of inefficiency, neglect of duty, or malfeasance in office. *See, e.g.*, 44 U.S.C. § 3502(5) (listing as "independent" for purposes of the Paperwork Reduction Act 16 particular agencies); Breger & Edles, *Established By Practice*, 52 ADMIN. L. REV. at 1114 n.6, app. at 1236-94 (cataloging "independent agencies").

Along the same lines as *Humphrey's Executor*, the Supreme Court's 1988 decision in *Morrison v. Olson* upheld a good-cause restriction on removal of an *inferior* executive officer by a head of department who was an alter ego of the President (that is, by a head of department removable at will by the President). *See* 487 U.S. 654. In particular, the Court upheld the independent counsel provisions of the Ethics in Government Act of 1978, including the restriction on the Attorney General's power to remove an inferior officer (the independent counsel) only for "good cause." *Id.* at 685. In the *Morrison* Court's view, because the President's alter ego (the Attorney General) retained the authority to remove the independent counsel for cause, the President's "power to remove" was not "completely stripped." *Id*. at 692. The for-cause removal provision of the statute therefore was deemed

not to "unduly trammel[] on executive authority" any more than in *Humphrey's Executor*. *Id*. at 691. The Court thus found no constitutionally significant difference for purposes of *Humphrey's Executor* between (i) the President removing an executive officer for good cause and (ii) a Presidential alter ego such as the Attorney General removing an executive officer for good cause. *See also In re Sealed Case*, 838 F.2d 476, 528 n.30 (D.C. Cir. 1988) (R.B. Ginsburg, J., dissenting) (Attorney General "is the hand of the President in taking care that the laws of the United States . . . be faithfully executed.") (internal quotation marks omitted) (alteration in original), *rev'd sub nom. Morrison*, 487 U.S. 654.[6]

By permitting a good-cause restriction on the removal of an executive officer by the President or the President's alter ego, there is no doubt that *Humphrey's Executor* and *Morrison* authorize a significant intrusion on the President's Article II authority to exercise the executive power and take care that the laws be faithfully executed. *See Morrison*, 487 U.S. at 695 ("It is undeniable that the Act reduces the amount of control or supervision that the Attorney General and,

---

[6] Like *Morrison*, the Court's short and unexplained 19th Century decision in *United States v. Perkins* also appeared to allow restrictions on removal of *inferior* officers by the head of an executive agency, at least where the agency was headed by a principal officer removable at will by the President (there, the Secretary of the Navy). *See* 116 U.S. 483 (1886). Assuming *Perkins* remains good law on the removability of inferior officers, *see generally* John F. Manning, *The Independent Counsel Statute: Reading "Good Cause" in Light of Article II*, 83 MINN. L. REV. 1285, 1332-33 n.167 (1999), it goes no further than *Morrison* in allowing restrictions on the President's removal of inferior executive officers. *See Morrison*, 487 U.S. at 689 n.27, 690 n.29.

through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity."); *Humphrey's Executor*, 295 U.S. at 628 (independent agencies are not "an arm or an eye of the executive").

For that reason, those cases have long been criticized by many as inconsistent with the text of the Constitution, with the understanding of the text that largely prevailed from 1789 through 1935, and with prior precedents such as *Myers* and *Parsons*. *See, e.g.*, Geoffrey P. Miller, *Independent Agencies*, 1986 SUP. CT. REV. 41, 93 ("*Humphrey's Executor*, as commentators have noted, is one of the more egregious opinions to be found on pages of the United States Supreme Court Reports."); *Morrison*, 487 U.S. at 733-34 (Scalia, J., dissenting) ("Today's decision . . . fails to explain why it is not true that – as the text of the Constitution seems to require, as the Founders seemed to expect, and as our past cases have uniformly assumed – all purely executive power must be under the control of the President.").

But we cannot, need not, and do not re-litigate those two cases here. For this Court, those cases are binding precedents on the removal question. The question is whether the Sarbanes-Oxley Act's restriction on the President's removal power over the PCAOB is unconstitutional under *Humphrey's Executor* and *Morrison*. As I explain below, the PCAOB contravenes those precedents and violates the Constitution.

C

The removal issue in this case arises because, unlike in *Humphrey's Executor* and *Morrison*, neither the President nor a Presidential alter ego can remove the members of the PCAOB. Rather, the Board is removable only by the

Securities and Exchange Commission, and only for cause. Put another way, the PCAOB is an independent agency appointed by and removable for cause by another independent agency.[7] This means that the President of the United States is *two* levels of for-cause removal away from the PCAOB, notwithstanding that the PCAOB performs numerous regulatory and law-enforcement functions at the heart of the executive power.

In 1935 and 1988, the Supreme Court found that the President retains at least some authority to remove for-cause executive officers and thus some degree of control over them. The Court further said that the President's power to remove either directly or through an alter ego was essential to the constitutionality of the for-cause removal statutes. *See Morrison*, 487 U.S. at 692. By contrast, the double for-cause removal provisions in the Sarbanes-Oxley Act completely strip the President's ability to remove PCAOB members, either directly or through an alter ego, and combine to eliminate any meaningful Presidential control over the PCAOB. As one commentator cogently stated, "defenders of the PCAOB's structure will have their work cut out for them

---

[7] As an independent agency whose Commissioners are considered removable by the President only for cause, the SEC (unlike the Attorney General in *Morrison*) is not the President's alter ego, a point not contested by the Board or the United States as intervenor. *See SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988); 44 U.S.C. § 3502(5). Some agencies are "specifically designed *not* to have the quality . . . of being subject to the exercise of political oversight and sharing the President's accountability to the people – namely, independent regulatory agencies such as the Federal Trade Commission and the Securities and Exchange Commission." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 916 (1991) (Scalia, J., concurring in part) (internal quotation marks and alteration omitted).

in arguing that the Constitution allows the PCAOB's five members to be even more independent from the President than the members of federal independent agencies."  Donna M. Nagy, *Playing Peekaboo with Constitutional Law: The PCAOB and Its Public/Private Status*, 80 NOTRE DAME L. REV. 975, 1056 (2005); *see also* Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 597 (1984) ("Whatever arrangements are made, one must remain able to characterize the President as the unitary, politically accountable head of all law-administration . . . .").

This case therefore presents what the majority opinion rightly labels a constitutional issue of first impression.  The question is whether to extend *Humphrey's Executor* and *Morrison* to uphold the removal restrictions in this Act – in other words, to interpret those precedents to permit not just independent agencies whose heads are removable for cause *by the President or his alter ego*, but also independent agencies whose heads are removable for cause *only by other independent agencies*.  I would not so stretch *Humphrey's Executor* and *Morrison.*  Four points inform my conclusion.

*First*, the lengthy recitation of text, original understanding, history, and precedent above leads to the following principle:  *Humphrey's Executor* and *Morrison* represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power.  Therefore, given a choice between drawing the line at the holdings in *Humphrey's Executor* and *Morrison* or extending those cases to authorize novel structures such as the PCAOB that further attenuate the President's control over executive officers, we should opt for the former.  We should resolve questions about the scope of those precedents in light of and in the direction of the

constitutional text and constitutional history. *See Bowsher*, 478 U.S. at 724-26 & n.4; *cf. Hein v. Freedom from Religion Found., Inc.*, 127 S. Ct. 2553, 2571-72 (2007). In this case, that sensible principle dictates that we hold the line and not allow encroachments on the President's removal power beyond what *Humphrey's Executor* and *Morrison* already permit.

*Second*, the Supreme Court in *Morrison* has already specifically required that the President or his alter ego possess authority to remove an executive officer protected by a for-cause removal provision:

> Nor do we think that the "good cause" removal provision at issue here impermissibly burdens the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act. *This is not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the "faithful execution" of the laws.* Rather, because the independent counsel may be terminated for "good cause," *the Executive, through the Attorney General*, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act.

*Morrison*, 487 U.S. at 692 (emphases added).

That language from *Morrison* all but resolves the removal issue in this case. No doubt recognizing that this passage from *Morrison* dooms its submission, the Board tries to dismiss it as "dicta." PCAOB Br. at 43. I think not: This discussion contains the *Morrison* Court's essential

explanation for why the independent counsel statute's restriction on removal was permissible under *Humphrey's Executor*. If that language from *Morrison* has meaning – and the Court clearly indicated that it would – it requires invalidation of the PCAOB. Here, unlike in *Morrison*, the "power to remove an executive official has been completely stripped from the President." 487 U.S. at 692.

*Third*, Justice Holmes reminded us that "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity. Neither the majority opinion nor the PCAOB nor the United States as intervenor has located any historical analogues for this novel structure. They have not identified any independent agency other than the PCAOB that is appointed by and removable only for cause by another independent agency. *Cf. Bowsher*, 478 U.S. at 725 n.4 ("Appellants have referred us to no independent agency whose members are removable by the Congress for certain causes short of impeachable offenses, as is the Comptroller General.").[8] The lack of precedent for the

---

[8] In all the laws enacted since 1789, it is always possible that Congress has created another structure like the PCAOB that exercises traditional executive functions and yet is two levels of for-cause removal away from the President – even though the research of the parties and the Court has not found such a needle in the haystack. Even if such an example were uncovered, this kind of "independent agency appointed by and removable for cause only by another independent agency" has been rare at best.

As the parties acknowledge, any civil service tenure-protected employees in independent agencies constitute no precedent for the PCAOB. First, consistent with the text of the Appointments Clause, the Article II removal precedents have focused on the President's control over "officers" – not "employees," who are

"lesser functionaries" typically exercising ministerial duties. *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). And any civil servants in independent agencies are employees, not officers, because they do not exercise "significant authority pursuant to the laws of the United States." *Id.* at 126; *cf. In re Sealed Case*, 838 F.2d at 497 ("[C]ivil servants are not thought to be the President's policymakers."), *rev'd sub nom. Morrison,* 487 U.S. 654. Second, in any event, civil service laws recognize the authority of the President or agency head to exempt certain employees from tenure protection as necessary and appropriate. *See, e.g.*, 5 U.S.C. §§ 2302(a)(2)(B), 3301-02, 7511(b)(2); *cf. id.* § 4802 (giving SEC express authority to hire officers and employees without regard to civil service laws); *see also* Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive in Historical Perspective*, 31 ADMIN. & REG. L. NEWS 5, 5-6 (2005).

Although the Board and the United States as intervenor did not point to them as a precedent, administrative law judges in the independent agencies are removable only for cause at the initiation of the agency that employs them and with approval of the Merit Systems Protection Board, *see* 5 U.S.C. § 7521, whose members in turn are removable only for cause by the President, *see id.* § 1202(d). But there are good reasons the Board and the United States did not cite ALJs as a precedent. First, an agency has the choice whether to use ALJs for hearings, *see* 5 U.S.C. 556(b); Congress has not imposed ALJs on the Executive Branch. Second, many ALJs are employees, not officers. *See Landry v. FDIC*, 204 F.3d 1125, 1132-34 (D.C. Cir. 2000) (ALJs in FDIC are employees because they possess only recommendatory powers that are subject to de novo review by agency). Third, ALJs perform only adjudicatory functions that are subject to review by agency officials, *see* 5 U.S.C. § 557(b), and that arguably would not be considered "central to the functioning of the Executive Branch" for purposes of the Article II removal precedents. *Morrison*, 487 U.S. at 691-92. Nothing in this dissenting opinion is intended to or would affect the status of employees in independent agencies who have congressionally mandated civil service tenure protection or the status of administrative law judges.

PCAOB counsels great restraint by the Judiciary before approving this additional incursion on the President's Article II powers.

*Fourth*, upholding the PCAOB here would green-light Congress to create a host of similar entities. Congress could thereby splinter executive power to a degree not previously permitted, in serious tension with Article II's conception of a single President who can control his subordinates and the exercise of executive power. Congress would have license to create a series of independent bipartisan boards appointed by independent agencies and removable only for cause by such independent agencies. Imagine an Energy Price Enforcement Board appointed by and removable only for cause by FERC, an Indecency Enforcement Board appointed by and removable only for cause by the FCC, a Mortgage Regulatory Board appointed by and removable only for cause by the Fed. All are permissible under the PCAOB's theory of the case. But in such a system, where is the President, in whom the Constitution vests the "executive power"?

In the past, when faced with novel creations of this sort, the Supreme Court has looked down the slippery slope – and has ordinarily refused to take even a few steps down the hill. As Justice Stevens stated for the Court in invalidating the structure of the Metropolitan Washington Airports Authority's Board of Review: "[T]he statutory scheme challenged today provides a blueprint for extensive expansion of the legislative power beyond its constitutionally confined role. . . . Congress could, if this Board of Review were valid, use similar expedients . . . . As James Madison presciently observed, the legislature 'can with greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.' Heeding his warning that legislative 'power is of an encroaching nature,'

we conclude that the Board of Review is an impermissible encroachment." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 277 (1991) (quoting THE FEDERALIST NO. 48).

As demonstrated in *MWAA*, when presented with arguments for "the kind of practical accommodation between the Legislature and the Executive that should be permitted in a 'workable government,'" *id.* at 276, the Court has strictly adhered to the constitutional text and the limitations of *Myers* and *Humphrey's Executor* and flatly and forcefully said no to novel policy inventions and corresponding structures that contravene Article II. *See id.* at 276-77; *Bowsher*, 478 U.S. at 736; *Buckley v. Valeo*, 424 U.S. 1, 132, 138-39 (1976); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *INS v. Chadha*, 462 U.S. 919, 945 (1983); *cf. Printz v. United States*, 521 U.S. 898, 922 (1997) (striking down Brady Act in part on separation of powers grounds because it effectively transferred President's law enforcement responsibility to state officials "who are left to implement the program without meaningful Presidential control (if indeed meaningful Presidential control is possible without the power to appoint and remove)"). We should do the same here, lest we give rise to a new "Fifth Branch" of the Federal Government. *Cf.* Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573.

In sum, the Sarbanes-Oxley Act created an entity that is inconsistent with the text and history of Article II, that the *Humphrey's Executor* Court did not confront much less endorse, that *Morrison* expressly rejects, that is apparently unprecedented in our history, and that could well lead to

serious additional encroachments on the President's removal authority. The PCAOB violates Article II.[9]

D

Underlying my conclusion that the PCAOB violates removal precedents is the premise that this *double* for-cause removal structure attenuates the President's control over the Board more than the typical *single* for-cause provision restricts the President's control over independent agencies (whose heads are removable for cause directly by the President). As explained above, text, history, precedent, and logic demonstrate that this premise is correct.

To be sure, some might argue that the President's Article II removal power over independent agencies is already so crippled by *Humphrey's Executor* and *Morrison* that this statute does no further discernible damage. The problem with any such suggestion, however, is that the Supreme Court upheld the for-cause restrictions at issue in *Humphrey's Executor* and *Morrison* on the precise factual assumption that they still permit the President some limited degree of control over executive officers. The Court concluded that a single

---

[9] The majority opinion seems to argue that the PCAOB is actually not an independent agency. *See* Maj. Op. at 23-24, 32-33. But that is the term that traditionally has been applied by the Supreme Court, the Congress, and the Executive Branch to agencies like the PCAOB whose heads are not removable at will. *See, e.g.*, *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 398 (1995); *Bowsher*, 478 U.S. at 724 n.4. The majority opinion can try to argue that this independent agency is constitutionally permissible under the Supreme Court's precedents. But its attempt to claim that the PCAOB is not even an independent agency defies long-accepted terminology and does not account for the meaning and effect of for-cause removal restrictions.

for-cause restriction did not unduly "interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison*, 487 U.S. at 690. Importantly, the *Morrison* Court distinguished the situation there from a case (like this one) where the power to remove had been "completely stripped" from the President. *Id.* at 692. The double for-cause removal provision at issue here completely strips the President's removal power and, as *Morrison* anticipated, poses a greater restriction on the President's constitutional authority than a single for-cause provision.

From the other direction, rather than argue that the President's well of executive removal power is already drained by the single for-cause restriction allowed by *Humphrey's Executor* and *Morrison* (so what's the harm with two?), some alternatively might contend that the President's control over an independent agency is actually not significantly affected by a for-cause removal provision (so again, what's the harm with two?). The majority opinion seems to latch onto this theory, *see* Maj. Op. at 23-24, which posits that, notwithstanding two for-cause removal provisions, the President can control the SEC and the PCAOB just as well as the President can control, for example, the Secretary of State and the U.S. Ambassador to Iraq. But that suggestion does not fully account for the text of for-cause statutes, the realities of Executive Branch decisionmaking, and the long-standing interpretations and understandings of Congresses, Presidents, and courts regarding independent agencies.

The for-cause removal restrictions attached to independent agencies typically prohibit removal except in cases of inefficiency, neglect of duty, or malfeasance. Those restrictions have significant impact both in law and in

practice. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 916 (1991) (Scalia, J., concurring in part) ("independent regulatory agencies such as the Federal Trade Commission and the Securities and Exchange Commission" are "specifically designed *not* to have the quality . . . of being subject to the exercise of political oversight and sharing the President's accountability to the people") (internal quotation marks and alteration omitted); *Mistretta v. United States*, 488 U.S. 361, 411 (1989) (good-cause provisions "specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies"). *Humphrey's Executor* and *Wiener* demonstrate, for example, that "for cause" removal requirements forbid dismissal by the President due to lack of trust in the administrator, *see* 295 U.S. at 625-26, differences in policy outlook, *id.*, or the mere desire to install administrators of the President's choosing, 357 U.S. at 356. In *Morrison*, the Court therefore took it as a given that "the degree of control exercised by the Executive Branch over an independent counsel is clearly diminished in relation to that exercised over other prosecutors, such as the United States Attorneys, who are appointed by the President and subject to termination at will." 487 U.S. at 696 n.34; *see also Buckley*, 424 U.S. at 133 ("The Court in [*Humphrey's Executor*] carefully emphasized that . . . the members of such agencies were to be independent of the Executive in their day-to-day operations . . . ."); *Humphrey's Executor*, 295 U.S. at 628 (independent agencies "cannot in any proper sense be characterized as an arm or an eye of the executive").

Consistent with the plain language, precedents, and common interpretation of those for-cause provisions, Presidents, Congresses, and officials in independent agencies work under the real-world understanding that the heads of the "independent" agencies possess some degree of congressionally conferred substantive autonomy from the

President (although exactly how much autonomy is not always clear). That understanding is why Congress continues to include for-cause removal restrictions when it wants to create an independent officer with some substantive autonomy – as it did yet again a few weeks ago. *See* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008) (creating new "independent" federal regulator of Fannie Mae and Freddie Mac appointed by President with advice and consent of Senate and removable for cause by President). In short, the double for-cause removal restriction cannot be justified by a theory that for-cause removal restrictions have no real meaning and effect.[10]

---

[10] There is some respected academic support for reading the text of the typical for-cause removal restrictions to be all but indistinguishable from removal at will. But that conclusion is not obvious as a matter of ordinary statutory interpretation, and it is not evident, therefore, that this approach would comfortably fall even within the scope of the constitutional avoidance doctrine. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); William K. Kelley, *Avoiding Constitutional Questions as a Three-Branch Problem*, 86 CORNELL L. REV. 831 (2001). If there is a problem with the statutory for-cause removal restrictions on the President's removal of so-called independent agency heads – and many think there may be, *see, e.g.*, Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541, 598 (1994) – the problem is likely because the for-cause statutes contravene constitutional principles, not because the relevant political and judicial actors have misinterpreted the statutes for seven decades to be more restrictive than their plain language actually requires and contemplates.

Notwithstanding that text, history, precedent, and logic show that for-cause removal provisions generally have significant effects, the Board persists in arguing that the second for-cause restriction at issue here – the restriction on the SEC's removal of the Board – does not meaningfully restrict the SEC's power over Board members. The suggestion is that Board members are no different from inferior officers in the SEC – like the SEC General Counsel – who are removable at will by the Commission. But the for-cause removal provision here (as elsewhere) carries real meaning. It ensures that the Board possesses some degree of substantive independence from the SEC: In particular, the SEC has no power to direct and supervise Board inspections, investigations, and enforcement actions. And the SEC cannot remove the Board for failing to follow any attempted substantive direction by the SEC with respect to specific Board inspections, investigations, and enforcement decisions – a point the Board never disputes. As a result, the for-cause removal restriction establishes, just as the congressional sponsors intended, that the PCAOB has "an extra guarantee of its independence and its plenary authority to deal with this important situation." 148 CONG. REC. S6327, S6331 (daily ed. July 8, 2002) (statement of Sen. Sarbanes). The for-cause removal restriction ensures, in other words, that the PCAOB operates as a "strong independent board." *Cf. id.* at S6330 (statement of Sen. Sarbanes) ("Title I of the bill creates a strong independent board to oversee the auditors of public companies."); S. REP. NO. 107-205, at 2 (2002) (Act creates "a strong independent board"); *id.* at 6 ("The successful operation of the Board depends upon its independence . . . ."). The for-cause removal provision supplies the basis for the trenchant observation of one of the supporters of this legislation that the PCAOB has "massive

power, unchecked power." 148 CONG. REC. at S6334 (statement of Sen. Gramm).[11]

The Board's argument for dismissing the impact of this second for-cause provision is particularly far-fetched in this case because the statutory restriction on the SEC's removal of the Board is far *more* stringent than the typical for-cause removal restriction. The Board is designed to be even more independent from the SEC when performing certain critical activities than, for example, the independent SEC is from the President. The statute permits removal only when a Board member has "willfully" broken the law, has "willfully abused" his or her authority, or "without reasonable justification or excuse" has "failed to enforce compliance." 15 U.S.C. § 7217(d)(3)(A)-(C). This is more restrictive removal language than the traditional for-cause language of inefficiency, neglect of duty, or malfeasance. This provision makes it even clearer that the SEC's substantive disagreements with the Board's decisions regarding specific inspections, investigations, or enforcement actions do not justify removal for cause – a critical point that the Board never contests and that badly undermines its argument for upholding the double for-cause removal restriction.[12]

---

[11] I cite these legislative materials not to alter interpretation of the text, but to demonstrate that the text's design of the PCAOB as an independent agency whose heads are protected against removal except for cause was exactly consistent with the legislative reports and statements, contrary to the strained interpretation of the majority opinion. *Cf.* Maj. Op. at 25-34.

[12] The Board notes that this case involves a facial challenge. But that does not affect the analysis; this is not the kind of case where a statute might be applied constitutionally in some instances but not in others. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Here, either the PCAOB is unconstitutionally structured, or it is not. The Board also invokes the doctrine of constitutional

The statutory language and history show, in short, that the effect and purpose of this statute was to wall off the PCAOB from comprehensive SEC control, not to make the PCAOB "an arm or an eye" of the SEC. *Cf. Humphrey's Executor*, 295 U.S. at 628. The Board's counter-factual, counter-textual argument ignores the double for-cause reality of this statutory scheme.

\* \* \*

In sum, neither the President of the United States nor a Presidential alter ego possesses any power to remove PCAOB members for cause or otherwise. The unique and apparently unprecedented double for-cause removal statute – an independent agency whose heads are removable for cause only by another independent agency – overruns the boundaries set by Supreme Court precedents in *Humphrey's Executor* and *Morrison* with respect to congressional encroachment on Presidential removal authority. I would hold it unconstitutional as a violation of Article II because it impermissibly restricts the President's power to remove executive officers.[13]

---

avoidance and seems to suggest interpreting the statute so as to minimize if not eliminate the provision restricting the SEC's removal of the Board. But the for-cause removal provision cannot legitimately be read entirely out of the statute; as a result, the doctrine of constitutional avoidance does not help the Board in analyzing the removal issue. *See DeBartolo Corp.*, 485 U.S. at 575.

[13] The majority opinion claims that this dissent articulates a theory that the President "must have at-will removal power." Maj. Op. at 33. Obviously that is an inaccurate reading of this dissenting

## III

The Accounting Board also violates the Appointments Clause of Article II of the Constitution.

### A

To reiterate, the Appointments Clause provides that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2.

By its plain text, the Appointments Clause governs the appointment of all "Officers of the United States." The PCAOB does not dispute that its members are "officers" of the United States, rather than mere employees who are "lesser functionaries." *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). This concession was sound: PCAOB members have extraordinarily broad power under the Sarbanes-Oxley Act of 2002 to, among other things, promulgate rules, initiate and conduct investigations and inspections, compel testimony, and

---

opinion. *Humphrey's Executor* and *Morrison* permit certain for-cause removal statutes. My argument on the removal issue is that the statute at issue here contravenes those two cases.

impose sanctions. They plainly exercise "significant authority pursuant to the laws of the United States," and they therefore are officers who must "be appointed in the manner prescribed by" the Appointments Clause. *Id.* at 126; *see also Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991).

As the plain text of Article II provides and as the Supreme Court has long recognized, the Constitution "for purposes of appointment very clearly divides all its officers into two classes." *United States v. Germaine*, 99 U.S. 508, 509 (1879). The most important executive officers – the "principal officers," a term that includes at least the "heads of departments" – require nomination by the President and confirmation by the Senate. The Framers foresaw, however, that the advice-and-consent process "might be inconvenient" when "offices became numerous, and sudden removals necessary." *Id.* at 510. The Appointments Clause therefore says that Congress can provide for appointment of "inferior officers" *either* by Presidential nomination and Senate confirmation *or* "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2.

B

The Appointments Clause issue in this case turns on whether PCAOB members are "principal" or "inferior" officers as those terms are understood and have been explained in Supreme Court decisions. If the members of the PCAOB are principal rather than inferior officers, then the Board is an unconstitutional violation of the Appointments Clause because Board members are not appointed by the President with the advice and consent of the Senate, but instead are appointed by the SEC.

Unlike with respect to the removal issue, there are relatively few Supreme Court precedents on the "principal versus inferior" officer issue for Appointments Clause purposes. *See In re Sealed Case*, 838 F.2d 476, 481 (D.C. Cir. 1988) ("Two hundred years after the adoption of the United States Constitution the federal courts are, essentially for the first time, required to construe closely the appointments clause of Article II."), *rev'd sub nom. Morrison v. Olson*, 487 U.S. 654 (1988); *see also* Note, *Congressional Restrictions on the President's Appointment Power and the Role of Longstanding Practice in Constitutional Interpretation*, 120 HARV. L. REV. 1914, 1916 (2007). The dearth of precedent is easily explained as a matter of text and history. When Congress provides that appointment to a specific office requires Presidential appointment with Senate confirmation, the "principal versus inferior" question is irrelevant because that appointment procedure is constitutionally permissible for both principal and inferior officers. For example, the heads of the independent agencies are all appointed by the President with the advice and consent of the Senate, so it does not matter whether the officers are considered principal or inferior. Moreover, in most situations where Congress historically has provided for appointment of an executive officer by the Head of a Department, it was clear that the officer was inferior to that principal officer – because Congress did not prevent the principal officer from removing that inferior officer at will. *See generally Ex parte Hennen*, 38 U.S. 230, 259-60 (1839).

The Supreme Court most recently and most thoroughly analyzed the distinction between principal and inferior officers in *Edmond v. United States*, 520 U.S. 651 (1997). In that case, service members challenged the affirmance of their court-martial convictions by the Coast Guard Court of Criminal Appeals, an intermediate Executive Branch judicial

tribunal within the Department of Transportation.  That Coast Guard Court reviewed decisions of courts-martial, and its decisions were reviewed by the U.S. Court of Appeals for the Armed Forces. The service members argued among other things that the judges of the Coast Guard Court of Criminal Appeals were "principal officers."  This created a constitutional problem, they contended, because the judges had been appointed by the Secretary of Transportation, not by the President with the advice and consent of the Senate.  *See id.* at 655-56.

In an opinion by Justice Scalia for eight Justices, the Supreme Court rejected that argument.  Acknowledging that previous cases had not "set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes," *id.* at 661, the Court stated that "the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior" other than the President who was nominated by the President and confirmed by the Senate.  *Id.* at 662.  But it is "not enough" to identify other officers "who formally maintain a higher rank, or possess responsibilities of a greater magnitude."  *Id.* at 662-63.  The Court succinctly stated the test for discerning the difference between the two:  Inferior officers "are officers whose work is *directed and supervised* at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."  *Id.* at 663 (emphasis added).

Applying the "directed and supervised" test to the Coast Guard Court of Criminal Appeals judges, the *Edmond* Court concluded that they were inferior officers.  *See id.* at 666. The Court described two different ways the Coast Guard judges were "directed and supervised."  First, the Coast Guard

judges were "directed and supervised" by the Coast Guard Judge Advocate General (who is ex officio the General Counsel of the Department of Transportation) because they were removable *at will* by the JAG, and "[t]he power to remove officers . . . is a powerful tool for control." *Id.* at 664 (citing *Bowsher v. Synar*, 478 U.S. 714, 727 (1986); *Myers v. United States*, 272 U.S. 52 (1926)). As the Court also noted, the JAG prescribed rules of procedure for the court. Second, the Coast Guard judges were "directed and supervised" by the Court of Appeals for the Armed Forces because, by statute, their judicial decisions were subject to review by the Court of Appeals before the decisions took effect on the accused. The Coast Guard judges thus had "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.* at 665.[14]

## C

*Edmond* was a relatively easy case in which to apply the "directed and supervised" test: The officers were removable at will, and at-will removal has always been considered a powerful tool for control. *See id.* at 664. And the case involved intermediate *adjudicatory* officers in the Executive Branch whose decisions were subject to review by a higher adjudicatory body before taking effect, not executive officers who performed more typical executive functions such as

---

[14] As *Edmond* reveals, the analysis of whether an officer is "directed and supervised" depends on the express language of the statutes governing the officer in question. The *Edmond* test does not contemplate discovery or factual inquiry into how things work in different agencies with different superiors and subordinates. The analysis thus does not turn on the vagaries of particular supervisory relationships or personalities that might result in different degrees of actual supervision and direction. Rather, the constitutional analysis focuses on the structure set up by the statutory text.

conducting investigations, taking enforcement actions, and otherwise executing laws passed by Congress.

The task in this case is to apply the *Edmond* "directed and supervised" test to traditional executive officers who perform quintessentially executive functions, such as conducting investigations and inspections, and bringing enforcement actions.

*Edmond* and the basic principles underlying Article II teach that the key initial question in determining whether an executive officer is inferior is whether the officer is removable at will. Removability at will carries with it the inherent power to direct and supervise: "Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." *Bowsher*, 478 U.S. at 726 (quoting *Synar v. United States*, 626 F. Supp. 1374, 1401 (D.D.C. 1986)). Therefore, if an executive officer is removable at will and is not the head of a department, the officer ordinarily may be considered inferior for purposes of the Appointments Clause. And Congress in turn may provide for appointment by the President alone or by the head of the department, rather than through Presidential appointment with Senate advice and consent.[15]

---

[15] Whether removable-at-will executive officers are principal or inferior depends on their place in the Executive Branch organizational chart. The heads of departments have no superior other than the President; therefore, they are principal officers. By contrast, the remaining removable-at-will officers in the executive departments and agencies ultimately report not only to the President, but also to other superior officers in the Executive Branch chain of command. Therefore, they may properly be considered inferior officers.

By contrast, an executive officer removable only for cause is ordinarily designed and understood to be free from significant substantive direction and supervision by superiors. Indeed, that's the whole point of for-cause removal. *See Humphrey's Executor v. United States*, 295 U.S. 602, 625-26 (1935); *cf. id.* at 629 ("[I]t is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will."). Because the purpose and effect of for-cause removal are to give the officer some measure of substantive independence from direction and supervision, for-cause officers ordinarily are not "directed and supervised" for purposes of *Edmond*. Instead, they presumptively should be considered principal officers who must be appointed by the President with the advice and consent of the Senate (as are the heads of independent agencies other than the PCAOB). The key, therefore, to applying the *Edmond* test to a for-cause executive officer, therefore, is to appreciate that for-cause removal by its nature is generally inconsistent with the notion of being "directed and supervised" by a superior officer.[16]

---

[16] Presuming for-cause officers to be principal officers makes great sense when one considers the purposes of the Appointments Clause. Because for-cause officers are designed to be relatively immune from direction and supervision, it is all the more important at the front end to ensure full scrutiny of the officers' character and qualifications. The combination of Presidential nomination and Senate confirmation is the constitutionally preferred way to achieve that goal. *See* LAURENCE H. TRIBE, 1 AMERICAN CONSTITUTIONAL LAW § 4-8, at 684 (3d ed. 2000); *see also Freytag*, 501 U.S. at 884 ("The Framers understood, however, that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people."). That, indeed, is how the system works for the independent agencies (other than the PCAOB) now in existence;

To be sure, if a statute expressly provides that a for-cause officer could be removed for disobeying any direction or orders by a superior, that officer would be subject to direction and supervision via the removal power, much like at-will officers. But the vast majority of agency statutes do not specify that for-cause officers can be removed for such disagreement, no doubt because the point of allowing removal only for cause would not be clear in that situation. *Cf.* Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2323 (2001) ("[A] for-cause removal provision would buy little substantive independence if the President, though unable to fire an official, could command or, if necessary, supplant his every decision.").

As noted above, in finding the Coast Guard judges to be inferior officers, *Edmond* did not refer only to the fact that the Coast Guard judges were removable at will by the JAG. The Court also pointed out that the intermediate appellate adjudicatory body at issue in *Edmond* could not issue a final decision; instead, all of its decisions were subject to review and pre-approval by a superior court if requested by the accused or the JAG. The Court therefore stated that the officers in question had "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." 520 U.S. at 665. Although *Edmond* involved at-will adjudicatory officers, it is logical to assume that even *for-cause* executive officers who perform traditional executive functions – investigations, enforcement actions, and the like – still might be considered "directed and supervised" if a superior other than the President has statutory authority to prevent and affirmatively command, and to

---

their heads are appointed by the President with the advice and consent of the Senate.

manage the ongoing conduct of, all significant exercises of executive authority by the officer.[17]

Therefore, an officer removable only for cause is ordinarily not "directed and supervised" for purposes of *Edmond*, at least unless (1) the statute expressly provides that

---

[17] The independent counsel in *Morrison* was considered an inferior officer even though removable only for cause. But as the Court in *Edmond* stated: "*Morrison* did not purport to set forth a definitive test for whether an office is 'inferior' under the Appointments Clause. To the contrary, it explicitly stated: 'We need not attempt here to decide exactly where the line falls between the two types of officers . . . .'" 520 U.S. at 661-62 (quoting *Morrison*, 487 U.S. at 671). The critical facts that explain *Morrison* – and that also make it an unusual case on the inferior officer issue – are that the office was *temporary* and the counsel's duties and jurisdiction were considered limited. The temporary nature of the office is the same reason that *acting* heads of departments are permitted to exercise authority without Senate confirmation. *See United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official."); *see also Designation of Acting Dir. of the Off. of Mgmt. & Budget*, Op. Off. Legal Counsel at 3-4 (2003). Had the independent counsel been a *permanent* office for investigation and prosecution of crimes by high-level executive officers, and had the statute included the same for-cause removal restriction, it seems evident that the counsel would have been considered by the *Morrison* Court to be a principal officer requiring appointment by the President with the advice and consent of the Senate. In any event, for offices that are not temporary, the later decision in *Edmond*, not *Morrison*, controls the inferior-officer Appointments Clause analysis: *Edmond*, unlike *Morrison*, did expressly purport to set forth a definitive test for inferior officer status governing future cases such as this one.

the officer can be removed for failing to follow a supervisor's direction and supervision, or (2) the statute expressly provides that a superior officer other than the President has authority to prevent and affirmatively command, and to manage the ongoing conduct of, all of the officer's exercises of executive authority against the public (such as conducting investigations and taking enforcement actions).

D

Applying the *Edmond* analysis to this case, PCAOB members are principal officers.

To begin with, unlike the judges at issue in *Edmond*, PCAOB members are not removable *at will*. The SEC can remove PCAOB members only for cause.

Nor does the statute satisfy the conditions under which a for-cause officer can still qualify as inferior. The statute's for-cause removal provision does not allow the SEC to remove PCAOB members for failure to follow SEC direction and supervision. And the statute does not provide that the SEC can prevent and affirmatively command, and manage the ongoing conduct of, all PCAOB functions – most importantly, inspections, investigations, and enforcement actions.

In that regard, it again bears mention that the whole point of this statute – as evidenced in the statutory text and history – was to create an Accounting Board that would not be part of the SEC and not be subject to direction and supervision by the SEC with respect to Board inspections, investigations, and enforcement actions.[18] Rather, the text of the Sarbanes-Oxley

---

[18] The House overwhelmingly voted for a bill sponsored by Representative Oxley that would have authorized an accounting oversight entity *within the SEC*. *See* H.R. 3763, 107th Cong. § 2(b)

Act reflects the deliberate legislative choice to create an independent entity protected by for-cause removal from SEC interference. As the statutory text repeatedly shows, Congress did not want the PCAOB to have "here-and-now subservience" to the SEC. *Bowsher*, 478 U.S. at 727 n.5.

E

The Board nonetheless cites a scattershot of authorities that, it suggests, show that the Board is "directed and supervised" by the SEC and that Board members therefore are inferior officers. But those arguments are all unavailing. The key is this: None of the cited authorities gives the SEC power to prevent and affirmatively command, and to manage the ongoing conduct of, Board inspections, investigations, and enforcement actions.

*First*, the Board contends that after-the-fact review of Board *sanctions* by the SEC suffices to show that the SEC directs and supervises the Board with respect to its inspections, investigations, and enforcement actions. That makes little sense. One would not say, for example, that a U.S. Attorney is directed and supervised by a federal district court in his or her investigative decisions just because a court ultimately would have an opportunity to review any indictment or subpoena challenge. So too here. After-the-fact judicial or quasi-judicial review of enforcement decisions following an investigation does not remotely equate to direction and supervision for purposes of *Edmond*.

---

(2002). But the Senate passed Senator Sarbanes's proposed bill, which provided for the creation of a new oversight board protected from SEC interference by means of for-cause removal provisions. *See* S. 2673, 107th Cong. § 107 (2002). The Conference Committee effectively preserved the relevant portions of the Senate bill. *See* H.R. REP. NO. 107-610, at 24 (2002) (Conf. Rep.).

*Second*, the Board argues that the SEC has power to review Board *rules* before they take effect. That is true – and if the Board's sole statutory power were rulemaking, then it might be reasonable to conclude that the Board was "directed and supervised" for purposes of *Edmond.* But the problem with this argument is that the Board also has power to conduct inspections, investigations, and enforcement actions *without SEC direction and supervision.* Being directed and supervised in only one slice of an officer's portfolio does not render the officer inferior if the officer is not directed and supervised in other significant activities. To qualify as inferior, an officer must be statutorily subject to direction and supervision in all significant activities.

*Third*, the Board points out that the SEC, in certain circumstances, can exercise, take over, or limit some investigative and enforcement responsibilities assigned to the Board if the SEC chooses to do so (after on-the-record hearings). *See* 15 U.S.C. §§ 7217(d)(1)-(2). But the SEC's exercising, taking over, or limiting the Board's responsibilities does not amount to directing and supervising the PCAOB. For example, Congress can alter the jurisdiction of particular federal courts, but that does not make judges inferior to Congress, or "directed and supervised" by Congress. Congress may switch regulatory authority from one agency to another, but that does not make the initial agency "directed and supervised" by Congress. Again, the critical point is this: The SEC's theoretical power to alter the Board's jurisdiction does not equate to power to prevent and affirmatively command, and to manage the ongoing conduct

of, Board inspections, Board investigations, and Board enforcement actions.[19]

*Fourth* and finally, the Board seems to argue – albeit only in one oblique single-sentence footnote – that the SEC actually has statutory authority to issue rules by which the SEC could give itself power to direct and supervise all Board inspections, investigations, and enforcement actions. *See* PCAOB Br. at 26 n.3. There is a reason this bootstrapping argument appears in the Board's brief only in a single-sentence footnote. It is incorrect. The statute does not give the SEC that kind of authority; indeed, such authority would all but destroy the independence that the statutory text mandates and that Congress sought to ensure the Board would possess. Section 7211 states that the Board operates "subject to action by the Commission under section 7217." 15 U.S.C. § 7211(c); *see also* § 7211(f). Section 7217 in turn gives the SEC power to review only Board *rules* before they take effect. But § 7217 does not give the SEC power to direct or supervise Board *inspections*,[20] *investigations*,[21] *and*

---

[19] The SEC also has the power to "censure" the Board. § 7217(d)(2). But this has no more substantive impact than a critical press release, and thus is not relevant to the "directed and supervised" question.

[20] The PCAOB must conduct inspections at least once a year (or once every three years for smaller firms), a frequency requirement the Board can alter by rule with SEC approval. *See* §§ 7214(b)(1)-(2). But the SEC has no statutory authority to prevent and affirmatively command the initiation of an inspection of a given firm at a given time. *Id.* And even more importantly, the SEC has no statutory authority to manage the PCAOB's ongoing conduct of inspections of particular firms. On the contrary, the statute emphasizes the Board's discretion in the "[c]onduct of inspections." § 7214(d). Similarly, the fact that the PCAOB produces an inspection report that is submitted to the SEC and to state regulatory authorities does not mean the SEC (or the state

*enforcement actions*.  In addition, § 7202 provides that the SEC may promulgate rules "as may be necessary or appropriate in the public interest or for the protection of investors, and in furtherance of this Act."  § 7202(a).  The phrase "in furtherance of this Act" means, of course, that SEC rules have to further some aspect of the Act.  But the Act nowhere gives the SEC authority to direct and supervise Board inspections, investigations, and enforcement actions.  So § 7202 cannot be read as a bootstrapping provision that grants the SEC authority to issue rules giving itself power to direct and supervise Board inspections, investigations, and enforcement actions.[22]  Finally, the SEC's related power to

_____

regulatory authorities, for that matter) has statutory authority to manage the ongoing conduct of Board inspections.

[21] The majority asserts that Board investigations are "subject to Commission approval," at least "to the extent [an] inspection report forms the basis for a subsequent investigation."  Maj. Op. at 15.  But the majority's qualification undermines its assertion because the Board has absolute discretion to undertake investigations regardless of whether an inspection report has any particular content, or even whether such a report exists.  *See* § 7215(b)(1).  The statute specifies that the Board retains the power to "conduct an investigation of any act or practice . . . regardless of how the act, practice, or omission is brought to the attention of the Board."  *Id*.  The SEC thus does not have authority to prevent and affirmatively command Board investigations.  Moreover, the Act does not give the SEC authority to manage the ongoing conduct of Board investigations.

[22] The fact that the Board must issue general rules governing investigations, and that such rules are subject to the approval of the SEC, does not give the SEC authority to prevent and affirmatively command, and to manage the ongoing conduct of investigations.  There is a critical distinction between (i) approving general rules for investigations and (ii) preventing, affirmatively commanding, and managing the ongoing conduct of any particular investigation.  The latter power is essential for true direction and supervision.

amend Board rules does not constitute a backdoor grant of authority to exercise direction and supervision over Board inspections, investigations, and enforcement actions.[23]

In short, the Board cobbles together disparate pieces of statutory text to justify its mantra that the SEC's control over the Board is "comprehensive and pervasive" and that Board members are therefore inferior officers. But the Board cannot answer three key questions that completely undermine its mantra: How can we say that the Board is directed and supervised by the SEC given that the Board has plenary statutory authority to conduct its most critical functions – inspections, investigations, and enforcement actions – without *any* opportunity for the SEC to prevent and affirmatively command, and to manage the ongoing conduct of, those activities? What is the purpose and effect of the stringent statutory for-cause removal provision if the Board is simply a subordinate of the SEC subject to the SEC's "comprehensive and pervasive" control? And why should we accept the Board's characterization of itself as part of the SEC when, as both statutory text and history reveal, Congress specifically

---

[23] There is a separate problem with reliance on § 7202 and § 7217. It is not at all clear whether a statutory grant of bootstrapping authority to an agency for that agency to issue rules granting itself supervisory power over another officer, as opposed to a direct statutory grant of such supervisory authority, suffices to constitute direction and supervision for purposes of the *Edmond* test. Even if it could suffice, it is doubtful that the *Edmond* inferior-officer test would be satisfied unless and until such rules were issued and took effect (the SEC has issued no such rules as to the PCAOB). In any event, I need not address those theoretical questions in this case because the Sarbanes-Oxley Act does not give the SEC statutory authority to issue rules giving itself direction and supervision authority over Board inspections, investigations, and enforcement actions.

considered – and rejected – proposals to make the Board part of the SEC and Congress expressly decided to create the Board as an independent entity?

In sum, the PCAOB structure violates the Appointments Clause of Article II.[24]

---

[24] Because I would hold that the Act violates the Appointments Clause, I need not address plaintiffs' alternative argument that the SEC cannot appoint inferior officers in the SEC because it is not a "Department" and its five Commissioners collectively are not its "Head" for Appointments Clause purposes. On those two issues, however, I generally agree with the majority opinion that plaintiffs' submission is inconsistent with current Supreme Court precedents. On the former issue of what entities constitute departments, *Freytag* nominally left open whether the SEC is a department; but as Justice Scalia explained in his persuasive concurrence for four Justices, it would not make much sense to hold that independent agencies are not departments so long as *Humphrey's Executor* is good law. *See Freytag*, 501 U.S. at 892 (Scalia, J., concurring in part). On the latter issue of who is a head of a department, both text and long-standing Executive Branch interpretation confirm that the head of a department can consist of multiple persons. *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 151-53 (1996); *Authority of Civil Service Commission To Appoint a Chief Examiner*, 37 Op. Att'y Gen. 227, 231 (1933).

Although the heads of independent agencies are principal officers and heads of departments for purposes of the Appointments Clause, it is worth pointing out (lest there be any future misunderstanding) that they are not principal officers for purposes of the 25th Amendment. The 25th Amendment refers to a majority of the "principal officers of the executive departments" who may vote on a President's incapacity; that formulation was not intended to and does not include the heads of the so-called independent agencies.

53

IV

In *Morrison*, the Supreme Court not only considered the appointment and removal issues separately, but also asked whether the combination of the appointment and removal mechanisms "taken as a whole" violated "the principle of separation of powers by unduly interfering with the role of the Executive Branch." 487 U.S. 654, 693 (1988).[25] The Court thus seemed to contemplate a scenario (albeit somewhat difficult to imagine) whereby a statute complied with Article II removal principles and with the Appointments Clause, but nonetheless violated the constitutional separation of powers because of restrictions on the President's appointment and removal powers. In this case, of course, I need not address that possibility because I find a constitutional problem on both the appointment and removal issues.[26]

In considering the combination of the appointment and removal problems posed by the PCAOB, I add only one point: From an accountability perspective, the whole of this statute is worse than the sum of the parts because neither the President nor his alter ego has any role in the *appointment* of

---

[25] The Court cited *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977), as the basis for conducting this "taken as a whole" analysis. *See Morrison*, 487 U.S. at 693-96. *Nixon* was a case about executive privilege, not the President's appointment and removal powers.

[26] I do not read *Morrison* to contemplate the converse – that a statute that violates the removal precedents or the Appointments Clause could nonetheless be allowed under some kind of overriding separation of powers principle. That would make little sense, and the decisions in cases such as *Buckley* and *Bowsher* suggest that there is no such "taken as a whole" override that could excuse a violation of Article II removal principles or of the Appointments Clause.

Board members or in the *removal* of Board members. *Cf. Printz v. United States*, 521 U.S. 898, 922-23 (1997). Each problem compounds the other, as Professor Tribe perceptively suggested when describing the Article II accountability issue with this kind of structure: "[I]n the particular situation in which an inferior officer is appointed by persons who are themselves not politically accountable . . . ongoing supervision by a politically accountable official, whether by the President or by someone serving at the President's pleasure, seems particularly important. In such circumstances, where there is little or no political accountability at the front end for the choice of that officer, a 'for cause' limitation on removal that renders political supervision impossible appears troubling from an accountability perspective." LAURENCE H. TRIBE, 1 AMERICAN CONSTITUTIONAL LAW § 4-8, at 684 (3d ed. 2000); *see also Humphrey's Executor v. United States*, 295 U.S. 602, 625-26 (1935) (noting that independent agency would be independent of President "*except in its selection*").

This Act is a problem on the appointment front and on the removal front. And taken as a whole, this unprecedented extra-constitutional stew is a clear violation of Article II's text, original understanding, and history, and of Supreme Court precedents.

## V

Three final points about this important case warrant comment.

*First*, the Department of Justice representing the United States as intervenor has defended the constitutionality of this

statute.[27]  To be sure, the defense has been rather tentative; at oral argument, the superb counsel from DOJ refused to say that the structure of the PCAOB would be permissible in *any* analogous situation, strongly implying that the Executive Branch's position is a ticket good for this train and this day only.  In any event, the Executive Branch has defended the statute as consistent with Article II.[28]  This is reason for respectful consideration.

---

[27] History tells us that Executive Branch prerogatives have, in some instances, taken a backseat to the President's other more immediate policy, legislative, or political priorities.  *See* Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the Second Half-Century*, 26 HARV. J.L. & PUB. POL'Y 667, 734-36 (2003) ("Lincoln's vigorous and partisan use of the removal power . . . indicates his firm belief in the unitariness of the executive and the importance of presidential control throughout the executive branch.  On the other hand, Lincoln offered no objection when Congress enacted legislation limiting Lincoln's power to remove the Comptroller of the Currency . . . .").

[28] The United States as intervenor has argued that the PCAOB is better from a Presidential control perspective than the private self-regulatory accounting organizations that previously existed to regulate the accounting industry.  This is an odd argument as a matter of constitutional law.  The fact that the President would have less control over a *private* organization than over an Executive Branch entity is both obvious and irrelevant.  It certainly does not excuse compliance with Article II's principles regarding Presidential appointment and removal of executive officers.  *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 148 n.70 (1996) (Congress may not "evade the 'solemn obligations' of the doctrine of separation of powers by resorting to the corporate form . . . .") (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)).

But as the Supreme Court has stated when this situation has arisen before, the Judiciary cannot defer to the Executive Branch in justiciable cases affecting individual rights simply because the Executive Branch does not assert its Article II prerogatives. The primary reason, as the Court has explained time after time, is that the separation of powers protects not simply the office and the officeholders, but also individual rights. As Justice Kennedy has stated, "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring); *see also Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991) ("The ultimate purpose of this separation of powers is to protect the liberty and security of the governed."); *Mistretta v. United States*, 488 U.S. 361, 380 (1989) (separation of powers is "essential to the preservation of liberty"); *Bowsher v. Synar*, 478 U.S. 714, 721-22, 730 (1986) (separation of powers is "critical to preserving liberty"); *INS v. Chadha*, 462 U.S. 919, 963 n.4 (1983) (Powell, J., concurring in judgment) (discussing concern that "Congress is exercising unchecked judicial power at the expense of individual liberties" and stating it was "precisely to prevent such arbitrary action that the Framers adopted the doctrine of separation of powers").

The point was captured well by Justice Blackmun in his opinion for the Court in *Freytag*: "In reaching this conclusion, we note that we are not persuaded by the Commissioner's request that this Court defer to the Executive Branch's decision that there has been no legislative encroachment on Presidential prerogatives . . . . The structural principles embodied in the Appointments Clause do not speak only, or even primarily, of Executive prerogatives simply because they are located in Article II. . . . The structural interests protected by the Appointments Clause are not those

of any one branch of Government but of the entire Republic." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 879-80 (1991). So too here.

*Second,* in the wake of accounting scandals, Congress enacted the Sarbanes-Oxley Act and created the PCAOB to serve important policy goals. Courts must respect Congress's policy objectives. But as the Supreme Court has repeatedly stressed, the importance of a policy does not license the Judiciary to ignore or weaken constitutional limits arising out of the separation of powers. "[P]olicy arguments supporting even useful 'political inventions' are subject to the demands of the Constitution which defines powers and, with respect to this subject, sets out just how those powers are to be exercised." *Chadha*, 462 U.S. at 945. Even assuming that the statutory scheme structuring the PCAOB is an effective means to regulate the accounting industry, "that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Id.* at 944. Over the years, the Supreme Court thus has struck down as inconsistent with the constitutional separation of powers the original method of appointing the Federal Election Commission, the legislative veto, the provision for congressional removal of the Comptroller General, the structure of the Metropolitan Washington Airports Authority's Board of Review, and the Line-Item Veto Act – several of which were at least as important as the PCAOB in terms of their policy objectives. Congress, fearing another accounting meltdown, may have "had good reason" for creating the PCAOB, but "such fears, however rational, do not by themselves warrant a distortion of the Framers' work." *Buckley v. Valeo*, 424 U.S. 1, 134 (1976).

*Third*, to reiterate, the PCAOB is uniquely structured, and a judicial holding invalidating it would be uniquely limited to the PCAOB. And Congress could easily fix the constitutional flaws by, for example, making PCAOB members subject to Presidential appointment with the advice and consent of the Senate and therefore removable by the President. *Cf.* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008) (creating new "independent" federal regulator of Fannie Mae and Freddie Mac appointed by President with advice and consent of Senate and removable for cause by President). Alternatively, Congress could fix the problem by making the PCAOB a truly subordinate part of the SEC – for example, by giving the SEC express authority to direct and supervise all Board actions and to fire Board members at will. In such a structure, the Board would not differ from any other inferior officers in the SEC. In the meantime, in my judgment, the Board's structure violates the Constitution of the United States.

∗ ∗ ∗

I would hold that the PCAOB's structure unconstitutionally restricts the President's appointment and removal powers. I respectfully dissent.